

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

§

MICHAEL D. KARNS,

§                                                No. 08-13-00314-CV

Appellant,

§                                                Appeal from the

v.

§                                                County Court at Law No. 5

JALAPENO TREE HOLDINGS, L.L.C.,

§                                                of Dallas County, Texas

MARK S. PARMERLEE, and PAUL

§

BAMBREY,

§                                                (TC# CC-11-06890-E)

§

Appellees.

## **O P I N I O N**

Appellant Michael Karns, owner of the El Fenix chain of Mexican food restaurants in the Dallas-Fort Worth Metroplex, sought to purchase a competing chain of Mexican food restaurants from Appellees Jalapeno Tree Holdings, L.L.C., Mark S. Parmerlee, and Paul Bambrey (collectively "Jalapeno Tree").  Although the parties initially agreed to certain terms outlined in a letter of intent ("LOI"), negotiations stalled and the deal ultimately collapsed.  The question here is whether Karns can hold Jalapeno Tree liable for breach of the LOI when the parties' subsequent attempts to reach a final, "definitive" sales agreement failed.  Under these facts, the trial court held that Karns cannot.  We affirm.[1]

---

[1] This case is on transfer to us from the Fifth Court of Appeals in Dallas.  We decide this case in accordance with that court of appeals' precedent.  *See* TEX.R.APP.P. 41.3; *Oceanus Ins. Co. v. White*, 372 S.W.3d 700, 702 n.1 (Tex.App.--El Paso 2012, no pet.).

# BACKGROUND

## FACTUAL HISTORY

### *Initial Offers and Preliminary Negotiations*

In August 2011, after several months of discussions, two companies made competing offers to purchase the Jalapeno Tree chain of restaurants. The first company was TaMolly's and the second was El Fenix, owned by Karns through Firebird Restaurant Group, L.L.C., a holding company. On August 14, Mark Parmerlee, Jalapeno Tree's owner, sent Karns an e-mail informing him that Jalapeno Tree received two offers from TaMolly's and stating that if Karns wished to move forward with the sale, it was "imperative" that the parties reach an agreement "as soon as possible" at a meeting scheduled for August 15.

The next day, Parmerlee and his team met with Karns, Firebird CFO Brian Livingston, and Firebird general counsel Bob Morrison to discuss terms of the parties' LOI. At the time of the proposed sale, Jalapeno Tree operated sixteen restaurants throughout the Dallas-Fort Worth area. Ten restaurants were located in buildings with long-term leases personally guaranteed by Parmerlee and his associate, Paul Bambrey. Jalapeno Tree owned the remaining six restaurant buildings, which were subject to various liens. The parties discussed numerous terms of sale before executing an LOI ("the August 15th LOI"). The parties revised the August 15th LOI numerous times over the next several days, but ultimately agreed to terms on August 25, executing a new LOI that superseded the previous LOI ("the August 25th LOI" or "the operative LOI"). Neither party disputes that the August 25th LOI is the document that governed this transaction.

### *The August 25th LOI*

The August 25th LOI is broken up into seven sections based on subject matter. Section 1

2

identified the assets to be sold and their proposed valuation. Jalapeno Tree's assets and operations excluding real estate were estimated to be worth $3.4 million. Jalapeno Tree's real estate holdings were valued at almost $8.75 million. The valuation was based on an understanding "that the assets of at least twelve (12) restaurants and real property (when conveyed) are and will be free and clear of any and all liens and that the real property is otherwise unencumbered except for such encumbrances that are standard for similar properties and which do not adversely affect such valuation." Jalapeno Tree promised to use "reasonable best efforts to obtain releases of liens on equipment for other four (4) locations[.]"

Section 2 of the LOI established the structure and mechanics of the proposed transaction. Karns agreed to form a shell company that would buy all of Jalapeno Tree's assets except for real estate for $2.4 million in cash and a $1 million promissory note personally guaranteed by Karns. Karns also agreed to retain two Jalapeno Tree executives for one year. The shell corporation would buy the six buildings owned outright by Jalapeno Tree over a scheduled seven-year period in a lease-to-own arrangement. With respect to the remaining locations subject to long-term leases, Karns agreed to assume and personally guaranteed the leases through the shell corporation, provided that Firebird Restaurant Group, L.L.C., could assume his guarantee obligations in the event the L.L.C. continued to perform as well as it did at the time of the LOI. According to Karns, this was a compromise move stemming from Jalapeno Tree's concerns about securing the transaction. Jalapeno Tree initially wanted to retain liens on the six buildings Karns purchased and foreclose on them in the event Karns defaulted on the remainder of the agreement. Karns rejected this proposal and proposed the shell corporation indemnity provision that appears in the August 25 LOI accepted by all parties. The security terms of the loans were vital to Jalapeno Tree and, as discussed below, they would later prove to be grounds

3

for dispute in later negotiations.

Sections 3 and 4 outlined the due diligence procedure leading up to the formal purchase. Jalapeno Tree agreed to furnish financial information and other due diligence information within seven days of a final agreement. Thereafter, Karns would have forty-five days to conduct a due diligence review. Closing would occur within forty-five days after the due diligence period expired, unless the parties agreed to extend that time period. Karns agreed to deposit $150,000 in earnest money with a title company as a show of good faith. If there were "any material adverse change in the Company or its operations[,] or if the information obtained during due diligence shows that the Company and/or its operations and assets are materially different that [sic] what has been represented by Company [sic]," Karns had the right to terminate the LOI and receive a refund of the earnest money deposit. The parties also agreed to maintain confidentiality throughout the process in Section 5.

In Section 6, the parties agreed that they "will use their reasonable good faith efforts to enter into a definitive agreement regarding the transaction on or before the expiration of twenty (20) days from the date this LOI is executed by each party. The definitive agreement will be on commercially reasonable terms and will include such representations, warranties, covenants, indemnities, conditions and post-closing cooperation . . . as are customary and usual for transactions of the nature described in this LOI." Jalapeno Tree, "in consideration of the convents contained herein and the Deposit" of earnest money, agreed to refrain from negotiating or entering into agreements with other buyers unless a definitive agreement could not be reached[2] "or this LOI is terminated by consent of each party or by default by Buyer in the performance of its obligations hereunder . . . ." Finally, Section 7 established that "[i]f either

---

[2] Section 6 allows either party to terminate the LOI in the event a definitive agreement could not be reached within 20 days.

4

party breaches its obligations under and pursuant to this LOI, the other party shall have such remedies as may be available at law or in equity."

### *Further Negotiations Stall*

Following execution of the August 25th LOI, the parties continued negotiations. On September 9, Jalapeno Tree sent Karns a proposed draft for a definitive agreement. In response, Morrison, Firebird's general counsel, sent Jalapeno Tree an "issues list." The list contains more than thirty topics, some of which contain multiple sub-topics that Morrison wished to discuss further. At trial, Morrison testified that he believed all the terms outlined in the issues list were significant. Jalapeno Tree representatives agreed to meet Morrison and discuss terms further on September 16. Parmerlee testified that after several hours of discussion, the parties had made progress on several points, but further negotiation was needed to resolve other terms, including the security terms of the loans. During this meeting, Jalapeno Tree provided Morrison with a proposed "security outline," to which Morrison later provided an itemized response agreeing to certain terms, but not others. Parmerlee continued to express concern about the security terms of the loans, but he and Morrison discussed several alternate options for the security terms. The negotiation period set by the LOI was set to expire on September 20. However, both parties agreed to extend negotiations until September 30.

Following the extension, negotiations continued. On September 28, Morrison proposed a new security agreement which eliminated Karns' prior personal guarantee, but he would now agree to increase the purchase price by $170,000. Parmerlee declined that proposal and testified at trial that he thought the proposed offer would leave him personally liable for $30 million in lease payments in exchange for what was essentially a five-percent down payment which he considered "ridiculous." Consequently, Parmerlee sent a counter-proposal, testifying that he was

5

beginning to have doubts about the deal. Morrison did not accept Parmerlee's proposal, but instead asked for another extension of the negotiation period. Parmerlee said he was interested in pursuing a deal, but did not want to extend the negotiation period any further.

The September 30 deadline passed without the parties reaching a definitive agreement. On October 3, Jalapeno Tree sent Karns an e-mail stating that it was exercising its power to terminate the LOI under Section 6. Karns then brought this suit.

## PROCEDURAL HISTORY

The parties consented to appointment of a special judge in this matter.[3] Following trial, the Special Judge rendered a take-nothing verdict in favor of Jalapeno Tree. In his findings of fact, the Special Judge found that paragraph six of the LOI expressly conditioned the asset sale on the parties negotiating and entering a final agreement within the specified time frame. The Special Judge also found *inter alia* that the parties did not intend to be bound to the asset sale absent a final agreement, that the asset sale terms were incomplete, that there was no meeting of the minds on all material and essential sale terms, that the parties attempted to negotiate a final agreement in good faith but failed, and that Jalapeno Tree did not breach the terms of the LOI before terminating it on October 3, 2011.

In his conclusions of law, the Special Judge held that the asset sale described in the LOI was not legally or equitably enforcement because: (a) the parties lacked the intent to be bound in the absence of a final agreement; (b) the asset sale did not contain all material and essential terms; (c) there was no meeting of the minds on all material and essential terms of sale; (d) the parties did not timely and successfully negotiate a final agreement; (e) the sale required third-party agreements or consents which were not and could not be compelled; and (f) the LOI was illusory because paragraph 3 gave Karns the ability to unilaterally terminate the LOI. This

---

[3] *See* TEX.CIV.PRAC.&REM.CODE ANN. §§ 151.001, 151.003 (West 2011).

6

appeal followed.

## DISCUSSION

In four issues, Appellant contends that the trial court's conclusion that the parties did not intend to be bound rested on legally and factually insufficient evidence, as no conditions precedent precluded formation of a binding contract (Issue One), the LOI contains all essential sales terms (Issue Two), and the LOI's terms are not vague or illusory (Issue Three). Appellant also asserts that the evidence underpinning the trial court's finding that Jalapeno Tree negotiated in good faith after signing the LOI is legally and factually insufficient (Issue Four). Jalapeno Tree counters that a final agreement was a condition precedent to sale, that essential contract terms were omitted from the LOI, and that there is sufficient evidence it negotiated in good faith.

We hold that the LOI created an enforceable agreement similar to an option contract[4] that froze the status quo between the parties for a period of time, prevented Jalapeno Tree from engaging in outside negotiations, and required both parties to further negotiate the terms of a nascent future contract in good faith. We also hold that the trial court's finding that Jalapeno Tree fulfilled its obligations under this agreement by negotiating in good faith is supported by legally and factually sufficient evidence. Finally, we conclude that even if the LOI outlined all essential terms of sale and would have otherwise bound Jalapeno Tree, no enforceable sales contract formed because the LOI's plain language shows that completion of the underlying transaction hinged on an unfulfilled condition precedent: the achievement of a subsequent, definitive agreement.

---

[4] An option contract is "[a] contract made to keep an offer open for a specified period, so that the offeror cannot revoke the offer during that period[.]" *Black's Law Dictionary* 1121 (7th ed. 1999)(definition 2 for "option"). "Typically, option contracts have two components: (1) an underlying contract that is not binding until accepted; and (2) a covenant to hold open to the optionee the opportunity to accept." *Durrett Dev., Inc. v. Gulf Coast Concrete, L.L.C.*, No. 14-07-01062-CV, 2009 WL 2620506, at \*4 (Tex.App.--Houston [14th Dist.] Aug. 27, 2009, no pet.)(mem. op.). In this case, Appellant-the *offeror*-sought to prevent the *offeree* from withdrawing from the transaction while the "option" term remained open.

7

**A.**

*Standard of Review*

At the conclusion of a bench trial, the trial court may issue findings of fact and conclusions of law. "Findings of fact in a nonjury trial have the same force and dignity as a jury's verdict." *May v. Buck*, 375 S.W.3d 568, 573 (Tex.App.--Dallas 2012, no pet.). We review the legal and factual sufficiency of those fact findings under the same standards as jury verdicts. *Id.* We first review the legal sufficiency of the evidence underpinning the fact-finding before turning to factual sufficiency. *Martin-Simon v. Womack*, 68 S.W.3d 793, 796 (Tex.App.--Houston [14th Dist.] 2001, pet. denied). "In addressing a legal sufficiency challenge, we view the evidence in a light most favorable to the finding, consider only the evidence and inferences that support the finding, and disregard all evidence and inferences to the contrary." *May*, 375 S.W.3d at 573. "We uphold the finding if more than a scintilla of evidence exists to support it." *Id.* "In reviewing a factual sufficiency challenge, we examine all of the evidence and set aside a finding only if the evidence is so weak or the finding so against the great weight and preponderance of the evidence that it is clearly wrong and unjust." *Id.*

We review the trial court's conclusions of law *de novo.* "When conducting a *de novo* review, the reviewing tribunal exercises its own judgment and redetermines each issue of . . . law." *Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex. 1998). "[E]rroneous conclusions of law are not binding on the appellate court[.]" *Heritage Resources, Inc. v. Hill*, 104 S.W.3d 612, 621 (Tex.App.--El Paso 2003, no pet.). However, "if the controlling findings of fact will support a correct legal theory, [and they] are supported by the evidence and are sufficient to support the judgment, then the adoption of erroneous legal conclusions will not mandate reversal." *Id.* In other words, "[i]f an appellate court determines a conclusion of law is erroneous, but the

8

judgment rendered was proper, the erroneous conclusion of law does not require reversal." *Town of Sunnyvale v. Mayhew*, 905 S.W.2d 234, 243 (Tex.App.--Dallas 1994, writ granted), *rev'd on other grounds*, 964 S.W.2d 922 (Tex. 1998).

We review questions of contract construction *de novo*. Whether contract formation is reviewed as a question of law or a question of fact hinges on whether the parties' intent to be bound is unambiguously expressed on the face of the contract. *See John Wood Group USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 16 (Tex.App.--Houston [1st Dist.] 2000, pet. denied). "[W]here that intent is clear and unambiguous on the face of the agreement, it may be determined as a matter of law." *Id*.; *see also COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 666 (Tex.App.--Dallas 2004, pet. denied)(noting that "in the ordinary case, the writing alone will be deemed to express the intent of the parties"). However, if the parties' intentions as expressed in the document are indefinite and unclear, ambiguity exists, and the issues of contract formation and intent to be bound become questions of fact. *John Wood Group*, 26 S.W.3d at 16. "Objective, not subjective, intent controls." *COC Servs., Ltd.*, 150 S.W.3d at 666.

**B.**

*Contract Formation and Construction*

We first address whether a binding contract between Karns and Jalapeno Tree ever formed and if so, on what terms.

**1. Do the Courts Treat LOIs Differently from Other Contracts?**

In its brief, Jalapeno Tree advances the broad theme that LOIs are or should be treated differently from other types of agreement under Texas contract law, raising both legal and policy arguments. We deal with these arguments at the outset in order to better ground our decision conceptually.

9

Jalapeno Tree appears to contend that no letter of intent can be made enforceable as a matter of law and that language stating that LOIs can theoretically be enforceable in several LOI interpretation cases is dicta undermined by the ultimate outcomes of the cases. *See, e.g., John Wood Group*, 26 S.W.3d at 19 (noting that an LOI can be binding but holding that the particular LOI in the dispute was not binding); *see also APS Capital Corp. v. Mesa Air Grp., Inc.,* 580 F.3d 265, 271 n.8 (5th Cir. 2009)(noting that "not a single case cited on this issue in *John Wood* involves a finding that there was a contract as a matter of law: either courts sent the issue to a jury, or found that there was no contract as a matter of law"). This position is belied by recent Texas Supreme Court precedent. In *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013), the Court reaffirmed a long-established rule that "[a]greements to enter into future contracts are enforceable if they contain all material terms." The Court explained the rationale underlying this rule, noting that while "agreements to enter into future contracts are often unenforceable . . . [because] courts have no way to determine what terms would have been agreed to after negotiation[,] . . . [t]his concern is not present when the agreement to enter into a future contract already contains all the material terms of the future contract." *Id.*

Jalapeno Tree recognizes that *McCalla* clearly articulates the rule set out "in dicta" in the LOI cases, but it attempts to distinguish *McCalla* on the basis that the Court there interpreted a Rule 11 agreement born from litigation and not an LOI, arguing that this distinction is critical from a policy perspective. According to Jalapeno Tree, just as Texas courts have a policy in favor of strongly enforcing Rule 11 agreements, Texas courts by policy are equally "loathe to enforce letters of intent in complex commercial transactions[.]"

Jalapeno Tree cites no authority in support of this contention, but rather seems to rely on a policy discussion of LOIs set out in *John Wood Group*. There, the First Court of Appeals

10

stated that "the basic concept of a letter of intent is to provide the parties with a way to structure their agreement without entering a binding contract" and noted that "[l]etters of intent play a valuable role in conducting complex business transactions." *John Wood Group*, 26 S.W.3d at 19. However, rather that establishing a policy in favor of treating LOIs as non-contracts, the Court cautioned that "the use of a letter of intent is not without risk. Absent careful drafting, the parties may find themselves bound by a letter agreement that does not contain all of the protections for which they would normally negotiate or for which due diligence is incomplete." *Id*.

The language in *John Wood Group* provides background information on what an LOI is and how it functions, but it does not establish any policy or hint at any judicial reluctance to treat LOIs differently from any other purported contract. Indeed, our review of the case law shows that our sister courts consistently interpret LOIs based on either a document's unambiguous language or based on the surrounding transactional circumstances when the document is unclear. *See, e.g., John Wood Group*, 26 S.W.3d at 19-20 (interpreting unambiguous LOI as a matter of law); *cf. Calvary Invs., L.L.C. v. Sunstar Acceptance Corp.*, No. 05-00-00508-CV, 2001 WL 371545, at *7-*8 (Tex.App.--Dallas Apr. 16, 2001, pet. denied)(not designated for publication)(reversing summary judgment grant where LOI was ambiguous and fact issues on intent to be bound existed).

We are mindful of the importance LOIs play in complex, highly-structured business transactions, but we need not resort to broad policy pronouncements that may affect the legal context in which these transactions occur. We are charged only with interpreting the intent of the parties at bar, and regardless of whether an agreement arises in the context of a Rule 11 accord ending litigation or in a multimillion-dollar leveraged buyout such as this, a contract is a

11

contract, and the standard rules of contract interpretation govern.

## 2. Did the Parties Form a Contract?

We next resolve the question of whether the parties intended to form a contract. "Parties form a binding contract when the following elements are present: (i) an offer; (ii) an acceptance in strict compliance with the terms of the offer; (iii) a meeting of the minds; (iv) each party's consent to the terms; and (v) execution and delivery of the contract with the intent that it be mutual and binding." *Calvary Invs., L.L.C.*, 2001 WL 371545, at *3. Although often treated as a distinct element, meeting of the minds is a component of both offer and acceptance measured by "what the parties said and did and not on their subjective state of mind." *Geophysical Micro Computer Applications (Int'l), Ltd. v. Paradigm Geophysical, Ltd.*, No. 05-98-02016-CV, 2001 WL 1270795, at *3-*4 (Tex.App.--Dallas Oct. 24, 2001, pet. denied)(not designated for publication). While a meeting of the minds dispute is usually treated as a question of fact, we will treat it as a question of law if the intent of the parties is clear from the face of the document. *John Wood Group*, 26 S.W.3d at 16.

As we previously stated, the standard rules of contract formation govern letters of intent. If the letter of intent is indefinite, does not contain essential terms, does not reflect an objective meeting of the minds, is premised on an unfulfilled condition precedent, or otherwise does not meet the requisite elements of a contract under state law, then no contract ever formed between the parties, and the LOI is unenforceable. However, if the LOI contains all essential terms as contemplated by the parties and the only remaining issue is formalization of the agreement or negotiation of ancillary terms, then the LOI may be an enforceable contract if the parties intended to be bound. *See Foreca, S.A. v. GRD Dev. Co., Inc.*, 758 S.W.2d 744, 744-45 (Tex. 1988)(because language on whether formal memorialization of a negotiated agreement was a

condition precedent to contract formation was ambiguous, the jury was free to resolve the parties' intent to be bound by the agreement as a fact question); *John Wood Group*, 26 S.W.3d at 19 (recognizing that LOIs must be carefully drafted to avoid premature formation of formal contract); *Geophysical Micro Computer Applications*, 2001 WL 1270795, at *3-*4 (reversing summary judgment where LOI outlined all essential terms, thereby creating a fact issue on the parties' intent to be bound). "The material terms of a contract are determined on a case-by-case basis." *McCalla*, 416 S.W.3d at 418.

Here, we find that the LOI's language unambiguously creates a contract, albeit one that is limited in scope. Section 7, dealing with breach, makes clear that the parties contemplated that the agreement would be mutually binding. However, as in *John Wood Group*, the LOI contains two types of covenants: those relating to the negotiation process ("the negotiation covenants") and those relating to the underlying sale ("the sale covenants"). The negotiation covenants establish the legal framework around the nascent sale and are of independent legal significance. While Jalapeno Tree is correct in stating that an "agreement to agree" is generally unenforceable under Texas law, *see Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000), the negotiation covenants as written show that the parties contemplated something more than a mutual desire to deal. When Sections 5 and 6 are read together, it becomes clear that in consideration of an earnest money deposit and mutual promises to negotiate confidentially and in good faith, Jalapeno Tree agreed to refrain from entertaining other offers for a set period of time. In this way, the LOI functioned almost as a reverse option contract. *See Durrett Dev., Inc.*, 2009 WL 2620506, at *4 (defining an option contract as an overarching agreement preventing an offeror from revoking his offer for a period of time, and an underlying contact that is effective upon the offeree's timely acceptance). Instead of the offeree purchasing the right to

13

keep an offer open, Karns, the offeror, obtained the right to keep Jalapeno Tree, the offeree, at the bargaining table for a period of time. As the United States Seventh Circuit Court of Appeals noted in *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1221 (7th Cir. 1988)(cited by First Court in *John Wood Group*), while "[n]either party has committed himself to the exchange[,]" by obtaining acceptance of the LOI, "the buyer secures the seller's undivided attention as long as progress continues in ironing out the points of the transaction." *Id.* at 1221. The LOI is enforceable insofar as the parties agreed to confidentially negotiate a final sales agreement in good faith and refrain from engaging other parties during that process.[5]

Karns argues that we should go one step further and hold that the LOI was sufficient to create a sales contract, since all terms essential to the sale were included and preliminarily agreed to by all parties. Jalapeno Tree vigorously disputes Karns' contention and maintains that numerous essential terms remained outstanding, as evidenced by subsequent discussions on numerous points. We need not delve into the fray here. Assuming *arguendo* that the sales covenants listed all essential sale terms, a contract will not become enforceable if a mutually agreed-upon condition precedent remains unfulfilled. *See Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976)(noting that a condition precedent may be "a condition to the formation of a contract").

Section 6 provides: "If the parties are unable to conclude the negotiation of a definitive agreement within the time provided herein, then either party may terminate this LOI and the

---

[5] Jalapeno Tree contends that the entire contract is illusory because Karns had the power to unilaterally terminate the LOI under Section 3 if there were a material adverse change in the company's financial situation, or the information that came out during due diligence was materially different. We disagree. An agreement that one party conditioned upon a satisfactory performance of another party is not illusory where the first party's ability to terminate is made in good faith or the "exercise of honest judgment." *See Cotten v. Deasey*, 766 S.W.2d 874, 878 (Tex.App.--Dallas 1989, writ denied); *Atomic Fuel Extraction Corp. v. Slick's Estate*, 386 S.W.2d 180, 185 (Tex.Civ.App.--San Antonio 1965, writ ref'd n.r.e.). Here, Karns only had the ability to terminate under Section 3 if there was a "material adverse change" in Jalapeno Tree's financial situation. As such, Karns' ability to unilaterally terminate the agreement is restricted, and whether he exercised that power in good faith had the parties reached that point would be a fact question to be resolved by the trial court. *See Cotten*, 766 S.W.2d at 878.

14

Deposit shall be returned to Buyer." Although the LOI does not explicitly state that it is non-binding as in *John Woods Group*, this language, which grants either side the option to terminate the LOI, clearly indicates that the parties intended to go through with the sale only if they reached a "definitive agreement." In other words, both parties conditioned acceptance of the sale on completion of a final agreement.

While Karns correctly notes that "[i]t is a rule of construction that a forfeiture by finding a condition precedent is to be avoided when possible under another reasonable reading of the contract[,]" *Schwarz-Jordan, Inc. of Hous. v. Delisle Constr. Co.*, 569 S.W.2d 878, 881 (Tex. 1978), no such reading is possible here. We must construe the document as a whole to determine if a clause is conditional and not merely a covenant, but "[t]erms such as 'if,' 'provided that,' or 'on condition that,' usually indicate an intent that the provision be a condition precedent rather than a promise[.]" *Id.* By establishing an escape clause triggered by a failure to reach a definitive agreement in a proscribed period of time, Section 6 makes clear that the definitive agreement is a condition precedent that absolutely must be fulfilled before either party is bound to the sale.

Karns is correct that the contract created by the LOI is not vague or illusory, and that it contained terms essential to its subject matter. However, Karns has overestimated the LOI's scope, as the agreement as written only creates an enforceable set of rules pertaining to the negotiation process. Because of this, and because the condition precedent of a definitive agreement never occurred, Karns' three appellate points pertaining to the sales covenants' enforceability are without merit.

Issues One, Two, and Three are overruled.

## C.
### *Breach of the LOI*

Finally, we turn our attention to whether Jalapeno Tree breached the LOI's enforceable negotiation terms. In his fourth issue, Karns attacks the legal and factually sufficiency of the trial court's findings that Jalapeno Tree did not breach the LOI and negotiated in good faith. Karns maintains that the evidence shows Jalapeno Tree engaged in bad faith by revisiting and insisting on security terms that differed from the preliminary sales covenants in the LOI. By doing so, Karns alleges that Jalapeno Tree deliberately prevented the condition precedent of a definitive agreement from occurring in order to escape the impending sales obligation. Karns maintains that where a party prevents the occurrence of a condition precedent, the condition is deemed to be fulfilled as a matter of law, and as such, the nascent sales contract became fully consummated and enforceable. *See Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex.App.--Houston [1st Dist.] 2003, pet. denied).

Assuming without deciding that Karns could hold Jalapeno Tree liable on the sales covenants based on bad faith obstructionist tactics that prevented a condition precedent from being reached, there is legally and factually sufficient evidence to support the trial court's finding that Jalapeno Tree did, in fact, act in good faith, thereby performing on its promise under the LOI and leaving the condition precedent intact and unfulfilled.

While there was some evidence to show that Jalapeno Tree sought to revisit the issue of security, we note that the plain language of the LOI did not prevent the parties from revisiting this issue or any of the sales covenants. The only limitation placed on the parties with respect to the sales covenants was that they negotiate in good faith. Furthermore, although Parmerlee stated in an e-mail the day after signing the LOI that he realized he had concerns about ensuring the shell corporation actually purchased the properties and that Karns guaranteed the full amount of leases and purchases, both parties actively engaged in the negotiation process, exchanging e-

16

mails about mutual concerns and meeting to discuss terms. Morrison stated in an e-mail that he believed the parties made real progress after their initial meeting, and Parmerlee also agreed to initially extend negotiations ten days past the LOI deadline. The deal only collapsed when the parties reached an impasse after Karns suggested that he increase his offer by $170,000 in exchange for release from personal liability on the leases, which Jalapeno Tree believed was commercially unreasonable. Karns did not continue negotiating after that point, and the LOI time period expired. There is nothing in the record that indicates to us that this was anything but an arms-length transaction between sophisticated parties.

In sum, viewing the evidence in the light most favorable to Jalapeno Tree, there is more than a scintilla of evidence showing Jalapeno Tree's good faith efforts to negotiation, and while the record as a whole is convoluted and conflicting, we cannot say that the trial court's finding that Jalapeno Tree negotiated in good faith went against the great weight and preponderance of the evidence.

Issue Four is overruled. The judgment of the trial court is affirmed.


February 20, 2015

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.

17