

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| IN RE: ROBERT J. GAUDET, JR., | § | No. 08-21-00054-CV |
| Relator. | § | AN ORIGINAL PROCEEDING |
| | § | IN MANDAMUS |
| | § | |
| | § | |
| | § | |

**O P I N I O N**

This is a mandamus action challenging the trial court's order expunging a notice of lis pendens related to real property located at 1747 Buckboard Street in El Paso, Texas (the Property). Relator Robert J. Gaudet, Jr., contends that the Honorable Selena Solis, Judge of the 243rd District Court, abused her discretion by expunging the lis pendens on the Property's deed records because he showed that he would probably succeed under a preponderance of the evidence standard on the four claims he has brought in a lawsuit against real parties in interest Icon Custom Home Builder, L.L.C, (Icon) and Juana Garcia (Icon's co-owner). Finding no error, the petition for a writ of mandamus is denied.

# I. BACKGROUND

## A. Factual History

Beginning October 2018, Gaudet and his wife entered into negotiations with Icon to obtain a lot and build a custom home. Early on in the process, Gaudet and his wife viewed two lots: one in the Franklin Hills subdivision and one in the Cimarron Canyon subdivision. Garcia quoted Gaudet differing prices for the two lots based on Icon's standard floor plans.

Although Gaudet originally sought to reserve a lot in the Franklin Hills subdivision, Gaudet ultimately decided to reserve a lot in the Cimarron Canyon subdivision due to price concerns with the Franklin Hills site, though the Gaudets weighed both sites against each other for a brief period of time. Gaudet alleges that on October 20, 2018, Garcia told him that Icon could build a house on the lot in Cimarron Canyon with the "Choice" set of features for $330,000, to include 2,300 interior square feet. Gaudet asserted in his trial court petition that, given Garcia remarked that additional square footage costs—i.e., $70 per square foot, her estimate meant that a house with 2,800 interior square feet would cost $365,000.[1]

The parties discussed the Tiverton Model, which provides a specific floor plan of 2,782 interior square feet. Gaudet alleges that, on November 9, 2018, Garcia told him that the Gaudets could build the Tiverton Model on the identified plot in Cimarron Canyon with 2,800 interior square feet for $360,000. On November 11, 2018, Gaudet emailed Garcia that he and his wife were choosing the lot at Cimarron Canyon over the lot at Franklin Hills. On November 16, 2018, Gaudet informed Garcia that he hired a surveyor to plot the land because he wanted the house oriented in a way that would allow light to fall through the house each year on the Winter Solstice. He also asked Garcia if she could alter the Tiverton Model plan to include custom requests.

---

[1] The total of $365,000 for 2,800 interior square feet was calculated as follows: ($330,000 + ($70 x 500)) .

On November 19, 2018, Gaudet signed a Builders Deposit Receipt with Icon. The Builders Deposit Receipt states:

> Icon Custom Home Builder, LLC ("Builder') has received a nonrefundable deposit in the amount of $500.00 ("Deposit") to begin work on a floor plan and/or to purchase the lot described below ("Property") for Robert Gaudet ("Buyer").
>
> [SECTION INITIALED BY RG] The Deposit will cover only the purchase of preliminary schemes and not the full set of plans. Once the Builder and Buyer have agreed on a scheme with a floor plan and elevation, and a contract for the purchase of a home has been signed, Builder will credit the Deposit towards the contract sales price. . . .
>
> [SECTION INITIALED BY RG] In the event the Builder and Buyer do not agree on a purchase price, the Builder will not refund the Deposit to Buyer.
>
> This document shows only an intent to purchase a property so Builder's representative or Real Estate Agent may start the process of showing inventory to Buyer, in which case the lot hold amount will be zero dollars ($0).
>
> Property: Lot 29, block: 8 subdivision Cimarron Canyon, City of El Paso, address: 1747 Buckboard St. . . . . Date: 11/19/18 Expiration: [BLANK].

The record shows that over the next few weeks, Gaudet and Garcia exchanged emails and met in person to discuss plans for the home build, including non-standard customization requests made by Gaudet. Each proposal offered by Icon was met with a counterproposal from Gaudet in which he and his wife asked for additional customizations that deviated from the standard Tiverton floor plan. On December 6, 2018, Icon provided an estimate of $386,000 to build a house on the lot. A dispute arose over the price of this estimate. Part of the dispute apparently centered around the placement of a courtyard in the interior of the house, which would cost $45 per square foot and raise the price of construction. The Gaudets also requested additional custom features, such as stone columns in the front of the house.

3

On December 26, 2018, Garcia emailed a design to the Gaudets, which the Gaudets rejected. Gaudet sent an email to Garcia stating that the design was not close to the Tiverton design and that "[w]e need a total price close to $350,000. I thought we might be able to go as high as $380,000 if we had extras such as Cynthia's stone columns in front, solar panels, and/or extra space." On January 3, 2019, the Gaudets met Garcia at Icon headquarters. According to Gaudet's trial court petition, Garcia said she could not build a courtyard at the price they wanted, and that she would have to get back to the Gaudets on whether Icon could build the Tiverton model with 2,800 square feet of interior space for $365,000. On January 8, 2019, Garcia emailed floor plans to the Gaudets for a 2,500 square foot house, with the price for the "Choice" plan being $384,000, and the price for the "Advantage" plan being $394,600. Choice and Advantage are different levels of plans Icon offers with differing customized features and finishes. On January 16, 2019, the Gaudets sent an email and certified letter demanding that Icon build the Tiverton model with 2,800 square feet for $365,000, the square footage price Garcia allegedly quoted prior to the signing of the Builders Deposit Receipt in November. The Gaudets stated that each room should be larger than 10' x 10', and that the plan should include a larger bedroom in lieu of a second-floor foyer, a pantry put somewhere other than the corner, and a rectangular family room, which were all allegedly requests the Gaudets previously made that Garcia did not include in the previous design. On January 22, 2019, Garcia emailed and said the company was turning the matter over to their attorney. Garcia's husband and Icon co-owner emailed Gaudet on February 15, 2019 requesting a meeting with Gaudet. Gaudet did not respond.

## B. Procedural History

According to the defendant's answer, Icon held the Property for more than a year in case Gaudet decided he wanted to continue negotiations for construction of the house, but Icon never received any further communications from Gaudet. Icon subsequently entered into a contract with

4

another buyer, began construction in August 2020, and has since constructed a different house on the Property.

In November 2020, after construction on the Property had already begun and after Gaudet had purchased another lot, Gaudet filed a lawsuit in the trial court contending that Icon fraudulently induced him into spending money related to the potential sale of the house. Gaudet's lawsuit also asked for specific performance and to require construction of a house and purchase of the Property at certain square footage prices, which he contends Icon had represented to him orally, during the in-person meetings, which were held prior to his signing of the Builders Deposit Receipt.

In connection with this suit, Gaudet filed a notice of lis pendens. Icon moved to have the lis pendens expunged, as the lis pendens was causing an issue that prevented a real estate transaction with the third party from closing (although the reporter's records from the hearing have not yet been filed). On March 19, 2021, the trial court held a hearing on whether to expunge the lis pendens. On April 1, 2021, the trial court granted an order expunging the lis pendens.

This mandamus action challenging the expungement order followed.[2]

## II. DISCUSSION

To be entitled to mandamus relief, a relator generally must meet two requirements. First, the relator must show that the trial court clearly abused its discretion by issuing an order. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding). Second, the relator must demonstrate that there is no adequate remedy by appeal. *Id*. at 135-36. The burden is on the relator to show he is entitled to mandamus relief. *See In re Ford Motor Company*, 165

---

[2] Concurrently with the petition, Gaudet filed a motion for emergency relief asking us to reinstate the lis pendens pending resolution of his mandamus petition and to stay all trial proceedings and the potential upcoming closing on a sale of the Property from Icon and Garcia to an unidentified third party until we resolve the merits of the mandamus petition. We asked for a response on the emergency motion from the real parties in interest. In their response, Icon and Garcia stated that a house for the third party had already been built, that the sale of the Property was scheduled to close on April 12, 2021, and that reimposition of the lis pendens would prevent closing of that sale. We denied Gaudet's request for emergency relief.

S.W.3d 315, 317 (Tex. 2005) (orig. proceeding). It is well settled that mandamus is the appropriate remedy when issues arise concerning the propriety of a notice of lis pendens. *See In re Collins*, 172 S.W.3d 287, 297 (Tex. App.—Fort Worth 2005, orig. proceeding). Thus, the question for this Court is whether the trial court abused its discretion by expunging the lis pendens.

"A lis pendens is a notice, recorded in the chain of title to real property warning all persons that certain property is the subject matter of litigation." *B & T Distribs., Inc. v. White*, 325 S.W.3d 786, 789 (Tex. App.—El Paso 2010, no pet.). "The purpose of a notice of lis pendens is to put those interested in a particular tract of land on inquiry about the facts and issues involved in the suit and to put prospective buyers on notice that they acquire any interest subject to the outcome of the pending litigation." *Id*. When the notice is properly filed, even a subsequent purchaser for value does not take the property free and clear. *See* TEX. PROP. CODE ANN. § 13.004(b).

The trial court may expunge a notice of lis pendens if (1) the pleading on which the original expungement order rests does not include a real-property claim; (2) the claimant does not appropriately establish the probable validity of his real-property claim; or (3) the claimant fails to serve a copy of the record notice on all entitled to receive it. *Sommers v. Sandcastle Homes, Inc.*, 521 S.W.3d 749, 753-54 (Tex. 2017) (citing TEX. PROP. CODE ANN. § 12.0071(c)(1)-(3)). To constitute a real property claim, the claim must "involve[e] title to real property, the establishment of an interest in real property, or the enforcement of an encumbrance against real property . . . ." TEX. PROP. CODE ANN. § 12.007(a). A real estate claim must "support the award of real property based on" the claim asserted. *See In re Chong*, No. 14-19-00368-CV, 2019 WL 2589968, at *2 (Tex. App.—Houston [14th Dist.] June 25, 2019, orig. proceeding) (mem. op.) (relator's breach of contract claim was not a real property claim because it would result in damages only and not a claim to title to the property the way a potential breach of fiduciary duty/unjust enrichment claim

6

could). We may review the expungement of a lis pendens for abuse of discretion via mandamus. *Id.*

Gaudet has pleaded claims for (1) violation of the Deceptive Trade Practices Act (Count I), (2) statutory fraud in real estate (Count II), (3) common law fraud (Count III), and (4) breach of the real estate contract (Count IV). On review of these claims, we conclude that the trial court did not abuse its discretion in expunging the lis pendens given that Gaudet's claims are either not real estate claims—because they do not entitle him to title or otherwise create an interest in the property—or, alternatively, even if a claim qualifies as a real estate claim, Gaudet has not shown he would probably succeed on the merits of the claim under the preponderance of the evidence standard.

## A. Gaudet's claims for DTPA, statutory fraud, and common law fraud are not real property claims that support a lis pendens; none of these claims establish an interest or encumbrance upon real property nor involve title to real property.

We begin with an analysis of whether each claim as pleaded is a "real property" claim. *In re Collins*, 172 S.W.3d at 297 (analyzing live pleadings to determine real property claim status). From a pleading standpoint, the Deceptive Trade Practices Act claim is not a real property claim at all; it neither establishes an interest or an encumbrance upon real property nor does it involve title to real property. Rather, a DTPA claim punishes conduct in the course of a business transaction by allowing for the award of damages. *See Miller v. Keyser*, 90 S.W.3d 712, 716 (Tex. 2002) (describing purpose of DTPA). As such, it cannot form the basis for a valid lis pendens.

Likewise, Gaudet's claims for statutory fraud in real estate and common law fraud are not pleaded as real estate claims that could support a lis pendens in the sense that they do not establish an interest or encumbrance upon real property, nor do they involve title to the Property. Gaudet alleges that Icon's alleged fraud induced him to spend time and money and suffer mental anguish

7

during the negotiation process. But the mere expenditure of time and money in the course of negotiations do not entitle him to force the sale of the real estate at issue here absent an actual agreement to sell the property. *See Yazdani-Beioky v. Sharifan*, 550 S.W.3d 808, 829 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (specific performance is an equitable remedy that first requires proof that a contract exists, was breached, and that monetary damages are inadequate to remedy the breach). Gaudet has not cited to any authority or provided any legal analysis supporting his position that Icon's allegedly fraudulent conduct would entitle him to the remedy of specific performance resulting in the transfer of the Property to him in the absence of an actual contract for sale.

Gaudet does allege, with respect to the common law fraud claim, that the builder fraudulently induced him into tendering a $500 deposit and spending dozens of hours in lost time. But again, Gaudet has not alleged he was fraudulently induced into entering an agreement that would establish an interest in real property, encumber real property, or enforce an encumbrance against real property as required to allow for continued imposition of the lis pendens. *See* TEX. PROP. CODE ANN. § 12.007(a). The purpose of specific performance is to compel a party, who is violating a duty to perform under a valid contract, to comply with the party's obligations; in other words, specific performance is the remedy of requiring exact performance of a contract in the specific form in which it was made. *See Internacional Realty, Inc. v. 2005 RP W., Ltd.*, 449 S.W.3d 512, 524 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). As we explain in greater detail below, the breach of contract claim, which is based on the Builders Deposit Receipt, does not create an interest in real property in and of itself; rather, it was a contract for design services and for the promise to continue further negotiations in hopes of obtaining a final agreement, similar to a letter of intent. As such, the statutory fraud in real estate claim does not establish an interest or

8

encumbrance upon real estate, nor does it involve title to real property. It cannot form the basis for a valid lis pendens.

### B. Even if Gaudet's breach of contract claim qualified as a real estate claim, he did not otherwise establish he would prevail on that claim.

Gaudet's claim for breach of contract is potentially a real estate claim. *See In re Cook*, No. 09-16-00420-CV, 2016 WL 7473894, at *1 (Tex. App.—Beaumont Dec. 29, 2016, orig. proceeding) (mem. op.). Thus, the question on mandamus review is whether the trial court erred in expunging the lis pendens because Gaudet established a probable right to relief on a claim for a contract that would establish a claim to title or otherwise encumber the Property. *Id.*

At the outset, it is important to note the Builders Deposit Receipt is not a contract for sale, nor does it create any enforceable rights against the Property. On its face, the Builders Deposit Receipt very clearly states that the document memorializes the payment of $500 in exchange for "the purchase of preliminary schemes and not the full set of plans." The Builders Deposit Receipt further states that "[o]nce the Builder and Buyer have agreed on a scheme" and "a contract for the purchase of a home has been signed," Icon will "credit the Deposit towards the contract sales price," and that "[i]n the event the Builder and Buyer do not agree on a purchase price, the Builder will not refund the Deposit to Buyer."

This is a classic option contract similar to a letter of intent in which the parties agreed to engage in preliminary negotiations but did not yet agree to a final sale. *See*, *e.g.*, *Karns v. Jalapeno Tree Holdings, L.L.C.*, 459 S.W.3d 683, 692-93 (Tex. App.—El Paso 2015, pet. denied). As such, even if Icon breached this contract, it would not create enforceable rights as to the underlying Property, which was clearly subject to further negotiation at a later stage of the transaction as contemplated by the Builders Deposit Receipt itself. *See id.* (breach of promises to keep negotiating did not entitle party to force sale of asset at a given price). Gaudet's reliance on the

Builders Deposit Receipt as creating a claim to the Property as opposed to merely the preliminary schemes drawn up by Icon is misplaced.

To the extent Gaudet is attempting to tack emails and other conduct onto the Builders Deposit Receipt to support the existence of a contract containing all material terms to a real estate transaction, Gaudet cannot meet his burden for obtaining mandamus relief.

Parties form a binding contract when the following elements are present: (i) an offer; (ii) an acceptance in strict compliance with the terms of the offer; (iii) a meeting of the minds; (iv) each party's consent to the terms; and (v) execution and delivery of the contract with the intent that it be mutual and binding. *Id*. at 692. While other types of contracts may be made orally, in Texas, the statute of frauds requires that real estate contracts be in writing. *See Nanda v. Huinker*, No. 13-13-00615-CV, 2015 WL 5634367, at *2 (Tex. App.—Corpus Christi Sept. 24, 2015, no pet.) (mem. op.) (noting that a contract for the sale of real estate "is not enforceable unless the promise or agreement, or a memorandum of it, is (1) in writing; and (2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him"); *see also* TEX. BUS. & COM. CODE ANN. § 26.01(a), (b)(4). And while nothing precludes an email from being considered as a writing that would consummate a contract, because email is used for "nearly every type of communication, from the flippantly inconsequential to the bindingly formal[,] . . . [w]hen it is alleged that an e-mail amounts to a contract binding on the sender, the e-mail's context must be carefully examined to determine whether it truly evidences the grave intent to be legally bound." *Copano Energy, L.L.C. v. Bujnoch*, 593 S.W.3d 721, 728 (Tex. 2020) (email did not establish intent to consummate pipeline purchase agreement).

In his mandamus petition, Gaudet does not point to any specific email in this voluminous record consisting of hundreds of pages of documents in which Garcia or any other agent of Icon

represents that Icon will construct and sell Gaudet a home with given features at a set price. In fact, a careful reading of Gaudet's pleadings and mandamus petition shows that Gaudet does not actually allege there was an offer and acceptance made in writing by email that would bind Icon and pass muster under the statute of frauds. Instead, Gaudet's precise argument is that Garcia orally represented that Icon could construct a home based on the prices given on October 20, 2018, and November 9, 2018, and that Gaudet understood these to be the firm price points in his mind when he signed the Builders Deposit Receipt on November 19, 2018.

However, it is the objective intent of the parties as expressed in the text of the mutually agreed-upon contract, and not Gaudet's subjective intent at the time of signing, that controls the breach of contract analysis. *See Karns*, 459 S.W.3d at 690. The text of the Builders Deposit Receipt makes no mention of any pricing per square foot. It also states that it is *not* a contract for sale, It explicitly contemplates the existence of future negotiations between the parties, and it also contemplates the potential that negotiations could fail by stating that the deposit made to secure plans and reserve a lot are nonrefundable in the event the parties cannot reach a contract for sale. In light of the unambiguous Builders Deposit Receipt, Gaudet's reliance on purported oral representations to vary the terms of that document is misplaced; extrinsic evidence that contradicts, varies, or adds to the terms of an unambiguous written agreement may not be considered in interpreting a contract under the parol evidence rule. *See Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 483 (Tex. 2019) (court would not consider pre-signing statements to contradict written terms of unambiguous contract).

Indeed, the emails in the record show that following the signing of the Builders Deposit Receipt, there was a lengthy negotiation process ongoing between Gaudet and Icon in which neither party was on the same page, with proposals made by Icon being met with repeated

11

counterproposals offered by Gaudet. Gaudet's continued efforts to negotiate additional non-standard features well into December 2018 and requests that Icon submit designs within a certain price range undercut the argument that he and Icon reached terms for a contract for sale at some unspecified point. The emails Gaudet offers do not show anything more that continued negotiations over house features, square footage, and other matters and their effect on the ultimate price of the house. *Copano Energy, L.L.C.*, 593 S.W.3d at 728-29 (exchange of emails containing proposals did not amount to consummated contract for sale).

Gaudet has not shown the existence of an enforceable contract for sale that would give him a claim to title to the Property, only the existence of a contract that provides for preliminary design services and an option to purchase the Property so long as he and the builder could reach final terms in the future. *Karns,* 459 S.W.3d at 692-93. Breach of that intent agreement alone would not entitle Gaudet to force the sale of the asset at a price of his choosing. *Id*.

In short, based on the mandamus record before us at this stage of litigation, Gaudet has not shown us that he will probably succeed in showing by a preponderance of the evidence that Icon breached a contract for sale to the Property that would entitle him to the specific performance he seeks. As such, the trial court did not abuse its discretion by expunging the lis pendens.

### III. CONCLUSION

The writ of mandamus is denied.

GINA M. PALAFOX, Justice

April 22, 2021

Before Rodriguez, C.J., Palafox, J., and Marion, C.J. (Ret.)
Marion, C.J. (Ret.), sitting by assignment