ACCEPTED
03-15-00025-CV
7932171
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/20/2015 3:24:06 PM
JEFFREY D. KYLE
CLERK

**No. 03-15-00025-CV**

𝕿𝖊𝖝𝖆𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘
𝕿𝖍𝖎𝖗𝖉 𝕯𝖎𝖘𝖙𝖗𝖎𝖈𝖙
𝕬𝖚𝖘𝖙𝖎𝖓, 𝕿𝖊𝖝𝖆𝖘

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/20/2015 3:24:06 PM
JEFFREY D. KYLE
Clerk

APPELLANTS, LAKEWAY REGIONAL MEDICAL CENTER, LLC AND SURGICAL DEVELOPMENT PARTNERS, LLC// CROSS-APPELLANT, LAKE TRAVIS TRANSITIONAL LTCH, LLC N/K/A LAKE TRAVIS SPECIALTY HOSPITAL, LLC

v.

APPELLEES, LAKE TRAVIS TRANSITIONAL LTCH, LLC N/K/A LAKE TRAVIS SPECIALTY HOSPITAL, LLC// CROSS-APPELLEES, LAKEWAY REGIONAL MEDICAL CENTER, LLC, SURGICAL DEVELOPMENT PARTNERS, LLC, BRENNAN, MANNA, & DIAMOND, LLC AND FRANK T. SOSSI

FROM THE 345TH JUDICIAL DISTRICT COURT, TRAVIS COUNTY, TEXAS
CAUSE NO. D-1-GN-12-000983

## APPELLANTS LAKEWAY REGIONAL MEDICAL CENTER, LLC'S AND SURGICAL DEVELOPMENT PARTNERS, LLC'S CROSS-APPELLEES' BRIEF

NORTON ROSE FULBRIGHT US LLP
Jeff Cody
State Bar No. 04468960
jeff.cody@nortonrosefulbright.com
Barton W. Cox
State Bar No. 2406508
beau.cox@nortonrosefulbright.com
James V. Leito IV
State Bar No. 24054950
james.leito@nortonrosefulbright.com
2200 Ross Avenue, Suite 3600
Dallas, TX 75201-7932
Telephone:     (214) 855-8000
Telecopier:     (214) 855-8200

*Counsel for Appellants/Cross-Appellees*

NORTON ROSE FULBRIGHT US LLP
Joy M. Soloway
State Bar No. 18838700
joy.soloway@nortonrosefulbright.com
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone:     (713) 651-5151
Telecopier:     (713) 651-5246

WRIGHT & CLOSE, LLP
Jessica Z. Barger
State Bar No. 24032706
barger@wrightclose.com
Raffi O. Melkonian
State Bar No. 24090587
melkonian@wrightclose.com
One Riverway, Suite 2200
Houston, TX 77056
Telephone:     (713) 572-4321
Telecopier:     (713) 572-4320

***ORAL ARGUMENT REQUESTED***

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................v

STATEMENT OF THE CASE...............................................................................x

STATEMENT OF ISSUES AND CROSS-POINTS ...............................................xi

STATEMENT OF FACTS ....................................................................................1

    I.     Facts relevant to LTT's cross-appeal relating to Section 2 of the Letter of Intent.....................................................................................1

    II.    Facts relevant to LTT's cross-appeal on its alleged misappropriation claim..................................................................3

    III.   Procedural history..................................................................................5

SUMMARY OF ARGUMENT ...............................................................................6

STANDARD OF REVIEW ....................................................................................8

ARGUMENT .......................................................................................................9

    I.     The Trial Court Correctly Granted Summary Judgment in Lakeway Regional's and SDP's Favor on LTT's Misappropriation Claim. ........................................................9

         A.    LTT failed to prove the existence of a trade secret that is at issue..........................................................................11

             1.    Because the Project File is a collection of documents assembled by LTT's trial counsel *after* the lawsuit was filed, it is not a trade secret...................12

             2.    It remains unclear which purported trade secrets LTT believes are at issue. ...............................................16

         B.    There is no evidence that Lakeway Regional or SDP used or disclosed LTT's purported trade secrets, and the evidence conclusively establishes that there was no use or disclosure. ...........................................................19

             1.    There is no evidence of *use* of a trade secret.................19

|   |   | 2. | The evidence conclusively establishes that there was no use of a trade secret. | 24 |

2. The evidence conclusively establishes that there was no use of a trade secret. ...........................24

3. There is no evidence of *disclosure* of a trade secret. .............................................24

4. The evidence conclusively establishes that there was no disclosure of a trade secret. ................26

C. There is no evidence that a purported disclosure or use caused LTT any damages, and the evidence conclusively negates causation. ..................................................26

1. There is no evidence of causation. ...............................27

2. The evidence conclusively negates causation. ..............29

II. The Trial Court Correctly Granted Summary Judgment in Lakeway Regional's and SDP's Favor on LTT's Claim for Breach of Section 2 of the Letter of Intent. ......................................31

A. Section 2 of the Letter of Intent is an unenforceable agreement to agree, foreclosing a claim for its breach. ...........31

1. The Letter of Intent contains several provisions showing that Section 2 is an unenforceable agreement to agree. ......................................32

2. Essential terms are lacking. ...........................................35

3. Section 2 is unenforceable for the separate reason that Section 3's best efforts provision is prohibitively vague. ......................................39

4. LTT's remaining appellate arguments do not withstand scrutiny. ......................................40

B. Unfulfilled conditions precedent foreclosed LTT's Section 2 claim. ..................................................41

C. SDP cannot be liable under Section 2 because it was not a party to the Letter of Intent. ..................................................44

III. The Trial Court Correctly Sustained Lakeway Regional's and SDP's Objections to LTT's Summary Judgment Evidence. ...............45

A. The trial court did not abuse its discretion in sustaining Objection 2. ..................................................46

        B.     The trial court did not abuse its discretion in sustaining Objection 4. ................................................................................47

PRAYER ................................................................................................49

CERTIFICATE OF WORD COMPLIANCE ...........................................51

CERTIFICATE OF SERVICE ...............................................................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bishop v. Miller,*
    412 S.W.3d 758 (Tex. App.—Houston [14th Dist.] 2013, no pet.) .............13, 23

*Bryant v. Clark,*
    358 S.W.2d 614 (Tex. 1962) ..................................................................................40

*CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.,*
    809 S.W.2d 577 (Tex. App.—Dallas 1991, writ denied)....................................39

*Clear Lake City Water Auth. v. Friendswood Development Co.,*
    344 S.W.3d 514 (Tex. App.—Houston [14th Dist.] 2011, pet.
    denied)..................................................................................................................42, 43

*Cortez v. Weatherford Indep. Sch. Dist.,*
    925 S.W.2d 144 (Tex. App.—Fort Worth 1996, no writ)..................................15

*Cudd Pressure Control, Inc. v. Roles,*
    328 F. App'x 961 (5th Cir. 2009)..............................................................22, 23

*DKH Homes, LP v. Kilgo,*
    03-10-00656-CV, 2011 WL 1811435 (Tex. App.—Austin May 11,
    2011, no pet.) (mem. op.)................................................................32, 33, 36, 40

*Fid. Fin. Servs. of the Sw., Inc. v. Corilant Fin., L.P.,*
    376 S.W.3d 253 (Tex. App.—Dallas 2012, pet. denied)....................................41

*FM Props. Operating Co. v. City of Austin,*
    22 S.W.3d 868 (Tex. 2000)....................................................................................45

*Ford Motor Co. v. Ridgway,*
    135 S.W.3d 598 (Tex. 2004) ............................................................................25, 26

*Fort Worth Indep. Sch. Dist. v. City of Fort Worth,*
    22 S.W.3d 831 (Tex. 2000)....................................................................................31

*Fuqua v. Fuqua,*
    750 S.W.2d 238 (Tex. App.—Dallas 1988, writ denied)..................................36

*Game Sys., Inc. v. Forbes Hutton Leasing, Inc.*,
    02-09-00051-CV, 2011 WL 2119672 (Tex. App.—Fort Worth
    May 26, 2011, no pet.) (mem. op.) ........................................................49

*Gillis v. Provost & Umphrey Law Firm, LLP*,
    No. 05-13-00892-CV, 2015 WL 170240 (Tex. App.—Dallas
    Jan. 14, 2015, no pet.) ........................................................................25

*Hancock v. Variyam*,
    400 S.W.3d 59 (Tex. 2013)..................................................................28

*Hinojosa v. Columbia/St. David's Healthcare Sys.*, *L.P.*,
    106 S.W.3d 380 (Tex. App.—Austin 2003, no pet.)............................47

*HK Partners, Inc. v. Power Computing Corp.*,
    No. 03-98-00124-CV, 1999 Tex. App. LEXIS 3981
    (Tex. App.—Austin May 27, 1999, no pet.)....................................46, 47

*Houston Mercantile Exch. Corp. v. Dailey Petroleum, Corp.*,
    930 S.W.2d 242 (Tex. App.—Houston [14th Dist.] 1996, no writ)............26, 27

*Hunter Bldgs. & Mfg., L.P. v. MBI Global, L.L.C.*,
    436 S.W.3d 9 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)................27

*II Deerfield Ltd. P'ship v. Henry Building, Inc.*,
    41 S.W.3d 259 (Tex. App.—San Antonio 2001, pet. denied)..........................44

*In re Bass*,
    113 S.W.3d 735 (Tex. 2003) ...............................................11, 12, 19

*Jacobs v. Satterwhite*,
    65 S.W.3d 653 (Tex. 2001) (per curiam)...........................................6

*Kachina Pipeline Co. v. Lillis*,
    No. 13-0596, 2015 Tex. LEXIS 914 (Tex. Oct. 9, 2015)...................34

*Karns v. Jalapeno Tree Holdings, L.L.C.*,
    459 S.W.3d 683 (Tex. App.—El Paso 2015, pet. denied)...............37, 38, 40

*Kevin M. Ehringer Enters., Inc. v. McData Servs. Corp.*,
    646 F.3d 321 (5th Cir. 2011) ...............................................................39

*King Ranch, Inc. v. Chapman*,
118 S.W.3d 742 (Tex. 2003) ...............................................................9

*Lamont v. Vaquillas Energy Lopeno Ltd., LLP*,
421 S.W.3d 198 (Tex. App.—San Antonio 2013, pet. denied)..........................26

*Leal v. McDonald's Corp.*,
No. 03-05-00500-CV, 2009 Tex. App. LEXIS 6151
(Tex. App.—Austin Aug. 5, 2009, no pet.) (mem. op.) .....................................21

*Lopez v. Munoz, Hockema & Reed, LLP*,
22 S.W.3d 857 (Tex. 2000).................................................................14

*Martin v. Beitler*,
No. 03-13-00605, 2015 Tex. App. LEXIS 6894
(Tex. App.—Austin July 7, 2015, no pet.) (mem. op.)..........................31, 32, 36

*McCalla v. Baker's Campground, Inc.*,
416 S.W.3d 416 (Tex. 2013) (per curiam) .......................................36, 37

*Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*,
606 S.W.2d 692 (Tex. 1980) ...............................................................14

*Moayedi v. Interstate 35/Chisam Rd., L.P.*,
438 S.W.3d 1 (Tex. 2014)...................................................................34

*Nguyen v. Allstate Ins. Co.*,
404 S.W.3d 770 (Tex. App.—Dallas 2013, pet. denied)..................16, 18, 46, 47

*Pickett v. Tex. Mut. Ins. Co.*,
239 S.W.3d 826 (Tex. App.—Austin 2007, no pet.)............................................8

*Precision Plating & Metal Finishing, Inc. v. Martin-Marietta Corp.*,
435 F.2d 1262 (5th Cir. 1970) (per curiam) .......................................24

*Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.*,
207 S.W.3d 801 (Tex. App.—Houston [14th Dist.] 2006, pet.
denied)..............................................................................................45

*Ramirez v. Colonial Freight Warehouse Co.*,
434 S.W.3d 244 (Tex. App.—Houston [1st Dist.] 2014, pet.
denied)..............................................................................................47

*Rusty's Weigh Scales & Serv., Inc. v. N. Tex. Scales, Inc.*,
    314 S.W.3d 105 (Tex. App.—El Paso 2010, no pet.) ...................................27, 30

*Ryland Group, Inc. v. Hood*,
    924 S.W.2d 120 (Tex. 1996) (per curiam) .....................................17, 18, 20

*Sharifi v. Steen Automotive, L.L.C.*,
    370 S.W.3d 126 (Tex. App.—Dallas 2012, no pet.) ...........................................44

*Star-Telegram, Inc. v. Doe*,
    915 S.W.2d 471 (Tex. 1995) ................................................................8, 26, 45

*Stewart & Stevenson Servs., Inc. v. Serv-Tech, Inc.*,
    879 S.W.2d 89 (Tex. App.—Houston [14th Dist.] 1994, writ
    denied).............................................................................................11, 17

*Sw. Energy Prod. Co. v. Berry-Helfand*,
    411 S.W.3d 581 (Tex. App.—Tyler 2013, pet. granted)...................................14

*T.O. Stanley Boot Co. v. Bank of El Paso*,
    847 S.W.2d 218 (Tex. 1992) ...........................................................................31

*Trilogy Software, Inc. v. Callidus Software, Inc.*,
    143 S.W.3d 452 (Tex. App.—Austin 2004, pet. denied) ...........................*passim*

*United Blood Servs. v. Longoria*,
    938 S.W.2d 29 (Tex. 1997) (per curiam)............................................................9

*Valence Operating Co. v. Dorsett*,
    164 S.W.3d 656 (Tex. 2005) ..............................................................................9

*Wellogix, Inc. v. Accenture, L.L.P.*,
    716 F.3d 867 (5th Cir. 2013) ............................................................................23

*York Grp., Inc. v. York S., Inc.*,
    No. H-06-0262, 2006 WL 2883363 (S.D. Tex. Oct. 10, 2006).........................39

## Rules

Tex. R. Civ. P. 193.6.........................................................................................29

## Other Authorities

Black's Law Dictionary 562 (10th ed.) ...............................................................24

Restatement of Torts § 757 cmt. b. ..........................................................19

Restatement of Torts § 757 cmt. c .........................................................24

54151498

Lakeway Regional and SDP follow the same naming conventions used in their Opening Appellants' Brief.

## STATEMENT OF THE CASE

| | |
|---|---|
| *Nature of the Case:* | This case arises from a September 15, 2009 Letter of Intent between Robert Berry and Keith McDonald, the principals of LTT, and Lakeway Regional. CR5697. The stated purpose of the Letter of Intent was to establish "ground rules" for exchanging information so that Lakeway Regional could decide whether to acquire a Lease for a hospital in Lakeway, Texas, which was then under construction. *Id.*<br><br>Lakeway Regional ultimately decided not to acquire the Lease, and this lawsuit ensued. LTT, as assignee of the rights of Berry and McDonald, asserted claims for breach of contract, misappropriation of trade secrets, and negligent misrepresentation against Lakeway Regional and its agent, SDP. CR4, 81. LTT later added the Attorney Defendants. CR122, 158. |
| *Trial Court:* | 345th Judicial District Court, Travis County, Texas. |
| *Course of Proceedings:* | This case was resolved partially on summary judgment and partially by a jury trial. The trial court granted summary judgment against LTT on its claims for trade secret misappropriation and breach of Section 2 of the Letter of Intent. The jury returned a verdict favorable to LTT on its breach of contract claim. LTT appeals the summary judgment order, while Lakeway Regional and SDP appeal from the judgment on the jury's verdict. CR12266, 12997; SCR3. |

## STATEMENT OF ISSUES AND CROSS-POINTS

1.      Did the trial court correctly determine that Lakeway Regional and SDP were entitled to summary judgment on LTT's claim for misappropriation of trade secrets?

2.      Did the trial court correctly determine that Lakeway Regional and SDP were entitled to summary judgment on LTT's claim for breach of Section 2 of the Letter of Intent either because (A) Section 2 is an unenforceable agreement to agree, or (B) the summary judgment evidence conclusively established that at least two conditions precedent to Lakeway Regional's obligations to perform under Section 2 were not satisfied and LTT had no evidence that either was satisfied? Also, did LTT waive error as to SDP because it failed to challenge all bases for the trial court's summary judgment on its Section 2 claim—namely that SDP was not a party to the Letter of Intent?

3.      Did the trial court properly exercise its discretion in sustaining Lakeway Regional's and SDP's objections to LTT's summary judgment evidence?

# STATEMENT OF FACTS

Lakeway Regional and SDP provided a comprehensive statement of background facts in their Opening Appellants' Brief. The facts below are limited to those relevant to LTT's cross-appeal.

## I. Facts relevant to LTT's cross-appeal relating to Section 2 of the Letter of Intent.

The Letter of Intent is dated September 15, 2009. CR5697. It addresses 11 separate topics, which generally fall into two categories.

The first category of topics concerns the acquisition of the Lease. **Section 1**, titled "Discussions and Negotiation of the Project," sets forth the time period during which the parties would have negotiations regarding the project, which time period could be extended. **Section 2**, titled "The Proposed Outline of the Terms of the Project," sets forth some of the terms and conditions that would be included in a full and complete agreement if Lakeway Regional decided to acquire LTT's Lease, including that Lakeway Regional would reimburse Berry and McDonald reasonable and documented costs advanced by them plus pay them $1.5 million. **Section 3**, titled "Required Approvals for the Project," sets forth five conditions precedent to Lakeway Regional's obligations under Section 2 and a "best efforts" obligation to satisfy each condition precedent. **Section 4**, titled "Earnest Money," provides that Lakeway Regional would deposit earnest money with an escrow agent and that if Lakeway Regional terminated the Letter of Intent for any reason,

54151498

1

the earnest money would be paid to Berry and McDonald. **Section 5**, titled "Term," states that the "Letter of Intent may be terminated by either Party, *for any reason*." (Emphasis added.) Nowhere does the Letter of Intent impose any affirmative obligation on Lakeway Regional to consummate the transaction "outlined" in Section 2.

The second category of topics sets out the ground rules for how the parties would conduct further due diligence and negotiations related to the potential transaction addressed in Section 2. **Section 6** contains a standstill and non-circumvention provision, providing that Lakeway Regional would not share any information with third parties gained in the negotiation and development process or independently use any proprietary information. **Section 9**, titled "Confidentiality," has numerous subsections. For example, **Section 9.1**, titled "Proprietary Information," provides that "all information disclosed by any Party or its Representatives at any time to any other Party or its Representatives . . . shall be deemed 'Proprietary Information.'" And **Section 9.7** restricts the type of information that could qualify for protection by making clear that certain information was not proprietary, including information that was in the public domain as of the date of the Letter of Intent or was received from a third party with no restriction on further disclosure.

Following the execution of the Letter of Intent, Lakeway Regional conducted due diligence on the project and ultimately determined that acquiring the Lease did not make economic sense. CR5709, 5840, 5857, 5859, 6031, 6264. On March 22, 2010, Lakeway Regional notified LTT of its decision. CR5709, 5878, 6131. At that time, LTT did not claim that it believed Lakeway Regional's decision was a breach of Section 2. This is consistent with the fact that Section 2 was not a binding obligation, but only a "Proposed Outline of the Terms" for the proposed Lease acquisition. LTT raised Section 2 for the first time in its breach of contract lawsuit, filed in April 2012. CR4.

## II. Facts relevant to LTT's cross-appeal on its alleged misappropriation claim.

***Sossi obtains LTT-related information months before any discussions between Lakeway Regional and LTT.*** More than a year before there were any discussions about the Letter of Intent, and as part of the process of developing Lakeway Regional, Lakeway Regional's attorney, Frank Sossi, learned information about LTT's Lake Travis Hospital from Health Care REIT and publicly-available documents. CR6013-14, 6435-36. The information Sossi learned from Health Care REIT about Lake Travis Hospital included financial information. Information that would have been publicly available to Sossi included a set of architectural plans for Lake Travis Hospital. *Id*.; *see also* CR5803, 6272.

***Lakeway Regional seeks financial support from HUD.*** As described in the opening briefs, part of Lakeway Regional's strategy for funding its hospital was to obtain loan insurance from HUD. On March 17, 2010, following a lengthy application and review process, HUD issued its initial commitment for loan insurance to Lakeway Regional, indicating that it intended to insure Lakeway Regional's loan. CR5884, 6014. On May 8, 2010, six weeks after issuing the commitment, HUD received a complaint from the CEO of another area hospital, questioning whether Lakeway Regional was in an underserved area because of the Lake Travis Hospital project, which was under construction. CR5614, 5719, 6141. In response to this complaint, HUD posed eight general questions about Lake Travis Hospital to Lakeway Regional's lender. *Id.* Lakeway Regional's lender forwarded HUD's questions to Sossi. CR5718, 6140. In a two-page email dated May 10, 2010 (the "May 10 email"), Sossi answered those questions for Lakeway Regional. CR5716-17, 6138-39. The May 10 email had no attachments.

On May 21, 2010, the HUD-insured loan closed. CR6308. After the loan closed, Sossi had some further communication with HUD regarding LTT's facility, including a June 21, 2010 letter (the "June 21 letter") that Sossi sent to HUD's Office of Litigation. CR8108-10.

***LTT accuses Lakeway Regional and SDP of misappropriating its trade secrets to convince HUD to issue loan insurance.*** LTT's misappropriation claims

hinge on Sossi's communications with HUD, particularly the May 10 email. According to LTT, Lakeway Regional and SDP used and disclosed LTT's trade secrets to HUD to convince HUD that Lake Travis Hospital was not a competitive facility. CR158, 172-74. But LTT has never articulated what LTT trade secrets were allegedly used or disclosed in the May 10 email or during any other communication between Lakeway Regional or SDP and HUD. Instead, below and now, LTT appears to claim that its so-called Project File is itself a trade secret. Cross-App. Br. 13-15. As explained below, the Project File cannot be a "trade secret" because it was actually created *by LTT's trial counsel*, with Berry's input, two years *after* this litigation commenced, and LTT's trial counsel stated on the record that the Project File is not a trade secret that was misappropriated. CR7598-600, 11494-500, 11506-07.

## III. Procedural history.

Two years after this case was filed, Lakeway Regional and SDP moved for summary judgment on LTT's claims for breach of Section 2 of the Letter of Intent and trade secret misappropriation. CR4, 5602 (Lakeway Regional's motion), 6020 (SDP's motion). The trial court, without specifying the bases, granted both motions. CR12266; *see also* CR12251 (Judge Yelonosky's letter ruling states: "Reasons given are not exclusive of other reasons I may have, will not be

incorporated in any order, and do not limit the bases of support for any order.").[1]
The trial court also sustained in part Lakeway Regional's and SDP's objections to LTT's summary judgment evidence. CR11486, 12261. LTT's remaining claims were tried to a jury, which returned a verdict partially in its favor. CR12997.[2]

## SUMMARY OF ARGUMENT

***Summary judgment on LTT's misappropriation claim was proper.*** Throughout this lawsuit, LTT has struggled to patch together evidentiary support for its trade secrets misappropriation claim. After two years of discovery, LTT mustered only superficial and conclusory responses to Lakeway Regional's and SDP's motions for summary judgment.

LTT was unable to identify any specific information that qualified as a trade secret under Texas law, and so its trial counsel, with Berry's input, created a purported trade secret just for this litigation and called it the "Project File," hoping that the sheer volume of paper in the Project File would obscure the lack of any trade secret.

---

[1] As discussed in Lakeway Regional's and SDP's Opening Appellants' Brief, although Judge Yelenosky granted summary judgment on LTT's Section 2 breach claim, Judge Livingston (who presided over the case during trial) submitted LTT's breach of contract claim in broad form, meaning that Section 2 was impermissibly before the jury. *See* Appellants' Opening Br. 49-57.

[2] LTT also alleged a claim for negligent misrepresentation. CR174. It lost part of this claim on summary judgment and the remainder at trial. CR12266-67, 13003. Because LTT has not appealed either the summary judgment order or the final judgment as to the negligent misrepresentation claim, the claim is abandoned. *Jacobs v. Satterwhite*, 65 S.W.3d 653, 655-56 (Tex. 2001) (per curiam) ("'grounds of error not asserted by points of error or argument in the court of appeals are waived'").

LTT was unable to present any evidence demonstrating how Lakeway Regional and SDP used or disclosed such information, and so it generally pointed to a few communications with HUD, hoping that speculation about the communications would overcome the lack of actual evidence of use or disclosure.

LTT was unable to present evidence demonstrating how the alleged use or disclosure caused LTT any injury or damage, and so it presents a new damage theory on appeal, hoping to avoid the absence of causation evidence, all the while ignoring the uncontroverted evidence from HUD that knowing earlier about Lake Travis Hospital would not have effected its decision to provide insurance.

LTT similarly failed to controvert Lakeway Regional's and SDP's evidence that they neither used nor disclosed LTT's alleged trade secrets.

***Summary judgment on LTT's breach of Section 2 claim was proper.*** By its terms, Section 2 memorializes only an agreement to agree—lacking essential terms and being terminable by any party for any reason—and so is unenforceable as a matter of law. Also, the enforceability of Section 2 was dependent upon the satisfaction of five condition precedents set out in Section 3. Lakeway Regional and SDP conclusively established that two of the five were not met, and LTT failed to submit evidence that the conditions were satisfied or excused. Finally, SDP moved for summary judgment on the basis that as a non-party to the Letter of Intent, it had no duty or obligation under Section 2. LTT failed to challenge this

independent basis for summary judgment, requiring that the summary judgment for SDP be affirmed.

***Objections to LTT's summary judgment evidence were properly sustained.*** The problems with LTT's misappropriation case manifested themselves in LTT's summary judgment evidence, which relied on the voluminous, created-for-litigation "Project File" as the purported trade secret. Yet no LTT witness ever identified which portions of the Project File constituted a trade secret. For these and other reasons, the trial court properly sustained Lakeway Regional's and SDP's evidentiary objections.

## STANDARD OF REVIEW

The standard for review of a traditional summary judgment is well established. When the trial court does not state the basis for its decision in its order, this Court will affirm on any meritorious ground asserted in the motion. *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995); *Pickett v. Tex. Mut. Ins. Co.*, 239 S.W.3d 826, 840 (Tex. App.—Austin 2007, no pet.). Thus, LTT was required to challenge every ground asserted in the motions in its brief. *Star-Telegram*, 915 S.W.2d at 473.

The standard of review of a no-evidence summary judgment is also well established. A no-evidence summary judgment is essentially a directed verdict

granted before trial, to which a legal sufficiency standard of review applies. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003).

Because the propriety of a summary judgment is a question of law, review is de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

Rulings on objections to summary judgment evidence are reviewed for an abuse of discretion. *United Blood Servs. v. Longoria*, 938 S.W.2d 29, 30-31 (Tex. 1997) (per curiam).

## ARGUMENT

**I.    The Trial Court Correctly Granted Summary Judgment in Lakeway Regional's and SDP's Favor on LTT's Misappropriation Claim.**

To recover for trade secret misappropriation, a plaintiff must establish: (1) a trade secret existed; (2) the trade secret was acquired through a breach of a confidential relationship or was discovered by improper means; (3) the defendant used or disclosed the trade secret without the plaintiff's authorization; and (4) the plaintiff suffered damages as a result. *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004, pet. denied).

Lakeway Regional and SDP filed a hybrid motion for summary judgment on LTT's misappropriation claim. They moved on traditional grounds on elements three (disclosure/use) and four (causation). CR5609, 5625-31, 6027, 6046-52. They moved on no-evidence grounds on elements one (existence of a trade secret),

three (disclosure/use), and four (causation). *See id.*[3] Thus, LTT had the burden to come forward with evidence, and raise a fact issue, that it has ***specific trade secrets***, that it gave ***those specific trade secrets*** to Lakeway Regional and SDP, that Lakeway Regional and SDP disclosed or used ***those specific trade secrets***, and that disclosure or use of ***those specific trade secrets*** caused LTT injury. None of this was shown below or now on appeal.[4]

***First***, LTT claims that its Project File—a collection of materials exceeding 2,000 pages—qualifies as a trade secret. But it cannot be a trade secret because it was created two years ***after*** LTT initiated this litigation ***by LTT's trial counsel*** for this litigation, and it includes correspondence among SDP and third parties.

***Second***, there is no evidence of use or disclosure of any alleged LTT trade secret. LTT claims that Lakeway Regional and SDP used or disclosed LTT's trade secrets in two ways: (1) in writing, through the May 10 email or the June 21 letter or (2) orally, during various meetings. CR11801-06, 11905-11; Cross-App. Br. 23-27. LTT never, however, connected any specific alleged trade secret to anything in these communications. In fact, Lakeway Regional's and SDP's

---

[3] Contrary to LTT's assertion (Cross-App. Br. 9-10), Lakeway Regional and SDP made no-evidence points on the element of existence of a trade secret. CR5628 (Lakeway Regional's motion: "[T]here is no evidence that the information that LTT claims is Protected Information actually qualifies as a trade secret under Texas law."); CR6049 (stating same in SDP's motion).

[4] LTT's amended summary judgment responses can be found at CR11790 (to SDP's motion) and CR11899 (to Lakeway Regional's motion).

10

summary judgment evidence conclusively established that there was no use or disclosure of any alleged trade secret.

***Third***, LTT failed to bring forth legally sufficient evidence of causation—that it was injured from some alleged disclosure or use of a trade secret. Lakeway Regional and SDP meanwhile presented uncontroverted evidence that negated the element of causation.

Thus, as detailed below, summary judgment was proper on LTT's misappropriation claim for these reasons.

## A. LTT failed to prove the existence of a trade secret that is at issue.

To qualify as a trade secret, the information or documents must be used in the plaintiff's business, and it must provide the plaintiff with the "'opportunity to obtain an advantage over competitors.'" *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (citation omitted); *see also Trilogy*, 143 S.W.3d at 463 (concluding that a trade secret is "for continuous use in the operation of the business"). LTT had the burden to show the existence of a "trade secret." *See Stewart & Stevenson Servs., Inc. v. Serv-Tech, Inc.*, 879 S.W.2d 89, 96-98 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (if the subject matter appropriated is not a trade secret, there is no liability for misappropriation).

***The big question is "What is the secret that was used or disclosed?"*** Frankly, if LTT had a valid claim, answering this question should have been an

easy task. But that has not been the case. Despite a lengthy discovery process lasting two years, multiple rounds of briefing in the trial court (*e.g.*, CR9627, 11899), and briefing before this Court, it remains a mystery which purported trade secrets LTT claims were misappropriated.

> **1. Because the Project File is a collection of documents assembled by LTT's trial counsel *after* the lawsuit was filed, it is not a trade secret.**

The focus of LTT's argument for the existence of trade secrets has been the so-called "Project File," which is a 2,033-page collection of documents. Cross-App. Br. 13 n.4, 42 n.15. Fatal to LTT's misappropriation claim is that the Project File was *not* used in its business. There is no evidence—and Berry certainly never swore in his declaration—that the Project File, as a "compilation," was used in LTT's business. Nor could it have been. As Lakeway Regional and SDP pointed out in support of their objections to LTT's summary judgment evidence (CR11486), the Project File was *assembled by LTT's trial counsel* with subsequent input from Berry, *more than two years after* the litigation was filed. CR11494-500. Thus, the timing of the Project File's creation makes it impossible under the law to satisfy the "used in one's business" requirement. *In re Bass*, 113 S.W.3d at 739. Similarly, since the Project File as a compilation was not used in LTT's business, it could not have given LTT a competitive advantage over others. *Id.*

Further, the Project File contains documents that were not owned by LTT. When constructing the Project File, LTT's trial counsel included emails produced *by SDP* during the litigation for which no one at LTT was a recipient. Indeed, the third document in the Project File (CR8682) is an email from Scott Brinker (of Health Care REIT, a third party) to Eddie Alexander (SDP's CEO) and Sossi that was sent before SDP and Lakeway Regional signed any confidentiality agreement, and that email contains no information that could possibly be construed as a trade secret. It merely states that LTT's principals were willing to have a discussion about the project.[5]

LTT's cases also fail to advance its argument. In those cases, the alleged trade secret was information compiled to create a competitive advantage, not compiled at a later date for litigation purposes. *See, e.g.*, *Bishop v. Miller*, 412 S.W.3d 758, 764-71 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (describing the evidence that supported the jury's finding that a compilation of 13 items constituted a trade secret). Indeed, in one cited case, the compilation trade secret is exactly what you might expect: a person used some ingenuity to mine public- and semi-public raw production data to identify sweet spots for oil and gas exploration

---

[5] The Project File includes many other documents which clearly do not contain trade secrets, such as the Confidentiality Agreement between SDP and LTT (CR8686), emails regarding revisions to the draft of the Letter of Intent (CR8709), the Letter of Intent (CR8721), the Escrow Agreement (CR8737), drafts of a lease assignment (CR8786), correspondence between counsel (CR8797), transmittal emails (CR8824, 8833), and the Lease (CR8858).

that had not yet been identified. *See Sw. Energy Prod. Co. v. Berry-Helfand*, 411 S.W.3d 581, 597-98 (Tex. App.—Tyler 2013, pet. granted). LTT did nothing of the sort here, and instead relies on its lawyer-created compilation.

Moreover, as Lakeway Regional and SDP pointed out in their objections to LTT's summary judgment evidence (CR11488), LTT's counsel stated during the deposition of LTT's trade secrets expert that LTT was ***not*** claiming that the Project File was a trade secret that was misappropriated:

> MR. COX: Let's go back on the record. Counsel, I understand you have a statement you'd like to make on the record.
>
> MR. WINGARD: Sure. Because I think it will help short-circuit testimony today, I want to state that ***LTT does not contend that the Project File***, which is Bates labeled 7875 through 9907 and was labeled Exhibit 324 in Mr. Berry's deposition, ***that that document in its entirety constitutes a trade secret that was misappropriated in its entirety***. However, LTT does contend that information contained within the Project File discreetly or in combination with other information is misappropriated.

CR11506-07 (emphasis added). Because LTT unequivocally stated that it was not asserting that the Project File constituted a trade secret, it is now foreclosed from claiming otherwise. *See Lopez v. Munoz, Hockema & Reed, LLP*, 22 S.W.3d 857, 864 (Tex. 2000) ("Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken."); *Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex. 1980) (identifying circumstances where testimony will constitute a binding judicial

admission and recognizing that "it would be unjust to permit a party to recover after he has sworn himself out of court by clear, unequivocal testimony"); *Cortez v. Weatherford Indep. Sch. Dist.*, 925 S.W.2d 144, 150-51 (Tex. App.—Fort Worth 1996, no writ) (party's deposition testimony acted as a conclusive judicial admission supporting summary judgment against that party).

It should be noted that throughout the case, LTT has gone back and forth on whether the Project File itself is a trade secret, sometimes claiming that it is and sometimes claiming that parts of it contain trade secrets. That volley continues here. On the one hand, LTT cites cases for the proposition that "a compilation of distinct information may be protected as a trade secret." Cross-App. Br. 11-13. But on the other hand, LTT never outright says the Project File is such a "compilation," instead noting that it is "a compilation of all the documentary evidence **reflecting**" not just LTT's trade secrets **but also** its "proprietary information." *Id.* at 13 (emphasis added); *see also id.* ("materials contained in the Project File constitute LTT's trade secrets"); *id.* (referring to "trade secrets included in that compilation").

LTT made similar statements below without ever exactly contending that the Project File itself was a trade secret. *E.g.*, CR11921 (referring to "trade secrets contained in the Project File"); CR11922 (referring to Project File as "containing and reflecting the trade secrets"). And, most importantly, in his declaration

supporting LTT's summary judgment response, Berry never says the Project File itself is a trade secret, noting instead that "***[m]uch*** of the information in the Project File is or reflects confidential and proprietary information that provided LTT with a competitive advantage, and LTT considered this information a trade secret." CR7607 (emphasis added).

LTT's inability—several years into this litigation—to simply state, in clear terms, that the created-for-litigation Project File is a trade secret should tell the Court all it needs to know about the strength of LTT's trade secret arguments.

### 2. It remains unclear which purported trade secrets LTT believes are at issue.

What pieces of the alleged "Project File" are a trade secret? LTT has yet to establish this fact.

***Components of the Project File have yet to be identified as trade secrets.*** In his declaration, Berry broadly identified certain categories of information in the Project File as alleged trade secrets (*e.g.*, current state of construction, physician support, and sources and uses of funds). CR7607. But he never identified where that information can be found in the ***voluminous***, 2,033-page Project File. Berry cited to the entirety of the Project File. CR7606 (referencing the "Bates range of the Project File"). This is insufficient. *See, e.g., Nguyen v. Allstate Ins. Co.*, 404 S.W.3d 770, 776-77 (Tex. App.—Dallas 2013, pet. denied) (trial courts are "'not

required to sift through voluminous'" evidence to see if a fact issue exists (citation omitted)).

To remedy this deficiency, LTT filed amended summary judgment responses—weeks after Berry submitted his declaration and after Lakeway Regional and SDP had objected to the Project File. CR11486, 11790, 11899. In doing so, LTT's trial counsel purported to identify certain "confidential, proprietary and trade secret information" within the Project File by category and Bates number. *See* CR11814, 11919; Cross-App. Br. 14-15. The documents identified by LTT's lawyers amount to 786 pages of the Project File. But ***no witness*** testified that any of these documents were actual trade secrets. That is, Berry never supplemented his declaration to confirm that the specific documents identified by LTT's trial counsel were, in his view, trade secrets, as opposed to being simply "confidential" or "proprietary" under the Letter of Intent. *See Stewart & Stevenson*, 879 S.W.2d at 99 ("[T]here is no cause of action for misappropriation of confidential information that is not either secret or, at least *substantially* secret."). Instead, LTT relied on Berry's prior declaration, which generally claimed that the "trade secrets in the Project File were not generally known or readily available to the public," without identifying the specific material or information. *See* CR7608. Berry's statement, however, is conclusory and lacking any probative value. *See Ryland Group, Inc. v. Hood*, 924 S.W.2d 120,

122 (Tex. 1996) (per curiam) ("Conclusory affidavits are not enough to raise fact issues."); *see also infra* at Section III.

Notably, LTT's amended responses did not even reference many of the categories of trade secrets that Berry identified (*e.g.*, the three examples given at the beginning of this section). In other words, the trial court was required to review the 2,033-page Project File (some of which LTT acknowledges is not a trade secret), and on its own, specifically identify which documents or information in the Project File were actual trade secrets. *Nguyen*, 404 S.W.3d at 776-77.

***No document or information outside of the Project File has been identified as a trade secret either.*** LTT makes a passing reference to "other things" besides the Project File as "substantial evidence of the existence of LTT's trade secrets." Cross-App. Br. 13 ("In its response to Defendants' motions, LTT included (among other things) the Project File . . . ."). However, LTT never identified any trade secret that exists outside of the Project File. And Berry's declaration only vaguely refers to information that was "conveyed to Defendants verbally" without identifying what that information was. CR7606.

In sum, the failure of Berry (or any other witness) to identify which specific LTT documents or information allegedly constitute a trade secret is fatal to LTT's claim. That LTT's trial counsel submitted ***argument*** purporting to identify LTT's trade secrets is no ***evidence*** of LTT's trade secrets. As a result, neither the parties

nor the Court can even begin to analyze the six-factor test for evaluating the existence of a trade secret. *In re Bass*, 113 S.W.3d at 739 (quoting factors from Restatement of Torts § 757 cmt. b (1939)).

Although this Court can affirm summary judgment on this ground alone, Lakeway Regional and SDP will address the other elements of LTT's misappropriation claim.

**B.      There is no evidence that Lakeway Regional or SDP used or disclosed LTT's purported trade secrets, and the evidence conclusively establishes that there was no use or disclosure.**

Having failed to show the existence of a trade secret, LTT unsurprisingly cannot show that Lakeway Regional or SDP actually disclosed or used any trade secret. While the focus of this element has been the May 10 email and other communications with HUD, the shortcomings are the same whether one looks at use or disclosure. There is no evidence of what trade secret was used/disclosed or how it was used/disclosed (*e.g.*, what specific aspect of the HUD communications actually used/disclosed a trade secret). Indeed, the uncontroverted evidence established that Sossi did not use/disclose any LTT trade secret when communicating with HUD about LTT's facility.

### 1.      There is no evidence of *use* of a trade secret.

"'Use' of a trade secret means commercial use, by which a person seeks to profit from the use of the secret." *Trilogy*, 143 S.W.3d at 464. The evidence of

use or disclosure must be tethered to an identified trade secret. *Id.* at 463 (referring to use of "the" trade secret found to be in existence).

As with much of this case, the May 10 email is the focal point of LTT's use argument. According to LTT, Lakeway Regional and SDP used LTT's trade secrets in the May 10 email to convince HUD that Lake Travis Hospital was not a competitive facility. Cross-App. Br. 24-25. This argument fails.

First, LTT never says ***what*** trade secrets were used in the May 10 email and which specific portion of the email purportedly used them.[6] The two-page May 10 email contains many statements that relate to LTT's Lake Travis Hospital, including its location, its size, and bed count. CR5716-17. Rather than identify how this email "used" a trade secret, LTT's entire argument on use is one sentence: "To convince HUD that LTT was not a competitive facility, and thereby fund LRMC's $166.9 mortgage, Defendants used LTT's trade secrets in the May 10th Email and subsequent correspondence with HUD." Cross-App. Br. 25. This conclusory statement is not legally sufficient evidence of "use" of some alleged trade secret. *See Ryland*, 924 S.W.2d at 122. Likewise, the unspecified "subsequent correspondence with HUD" cannot support "use" of any alleged trade secret. *Id.*

---

[6] LTT's misappropriation argument section spans 23 pages. Only five and one-half of those pages address the elements of use/disclosure. Cross-App. Br. 22-27. Nowhere in those five and one-half pages does LTT clearly state what or how a trade secret was used or disclosed.

Second, LTT speculates that because it provided Lakeway Regional and SDP with site- and building-related information, they, in turn, must have used that exact (allegedly secret) information to determine that it would be very costly to convert LTT's facility from a long-term health care facility to a general acute care facility, as Sossi stated in the May 10 email. Cross-App. Br. 24-25. But an equally likely inference is that Sossi reached that conclusion based on information obtained from Heath Care REIT or publically-available information. CR5886, 6013-14, 6435-36. LTT's speculation that Lakeway Regional's determination of conversion costs was based on use of LTT's trade secrets rather than other information independently available to Lakeway Regional is not probative evidence. *Leal v. McDonald's Corp.*, No. 03-05-00500-CV, 2009 Tex. App. LEXIS 6151, at *8-9 (Tex. App.—Austin Aug. 5, 2009, no pet.) (mem. op.) (affirming no evidence summary judgment based on equal inference rule).

Third, LTT's inability to identify how its purported trade secrets were used is compounded by its admission that the information conveyed in the May 10 email was false. Berry testified that many of Sossi's statements in the May 10 email were in fact false. In particular, Berry admitted that the following statements from the May 10 email were not true:

- LTT missed the deadline to qualify as an LTAC;
- The Lake Travis facility, in the fall of '09 and the spring of '10, had numerous code violations;

- Conversion of Lake Travis Hospital to a true general acute care hospital would cost a great deal of money;

- It would be difficult to expand Lake Travis Hospital in the future;

- LTT had no physician support;

- The lease was structured as a 100% interest-only lease;

- Lake Travis Hospital would not open in the summer of 2010;

- Lake Travis Hospital did not have an operator;

- Lake Travis Hospital did not have an operational staff;

- Lake Travis Hospital did not have a medical staff;

- Lake Travis Hospital did not have a list of interested physicians; and

- The City of Lakeway would need to approve any physical conversion changes from an LTCH to a general acute care hospital.

CR5809-12, 6231-34.

LTT is left to argue that evidence that a defendant conveyed *false* information to a third party that relates to or is similar to the plaintiff's purported trade secrets raises a fact issue of use. Cross-App. Br. 22-25. But none of LTT's cases support its unrecognized argument.

For example, in *Cudd Pressure Control, Inc. v. Roles*, 328 F. App'x 961 (5th Cir. 2009), the defendants, who were former employees of the plaintiff and the company that they joined to compete with the plaintiff, "showed" the plaintiff's confidential financial data to their investors to validate that what they were telling the investors about the opportunity "*was true*." *Id.* at 962-63, 966 (emphasis added). The Fifth Circuit found that such evidence raised a fact issue on the element of commercial use and reversed a summary judgment in defendants' favor.

22

*Id.* at 966.  Had Lakeway Regional and SDP shown LTT's confidential financial information to HUD, *Cudd* might be relevant.

In *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867 (5th Cir. 2013), the court found that where a defendant's document stated, "[u]se Wellogix content," a jury could find that the defendant relied on the plaintiff's software developed for oil and gas companies to develop its own software.  *Id.* at 877.  And in *Bishop*, the evidence showed that the defendant's operating plan incorporated 15 of the plaintiff's 21 component parts.  412 S.W.3d at 774.  LTT has not presented facts here that evidence use and instead offers its speculation that use occurred.  Stated differently, in a typical trade secret misappropriation case, as LTT points out in its brief at page 12, the defendant is alleged to have used the plaintiff's information either by copying it or taking advantage of it to achieve a competitive advantage of some kind.  *E.g.*, *Trilogy* (use of plaintiff's software); *Serv-Tech* (use of plaintiff's bid forms, business plans, job cost control and progress tracking methods); *Bishop* (use of plaintiff's potash mining process for acreage in Utah).  There is no evidence here of use in that way, which by itself was dispositive of LTT's trade secret claim, as the trial court found.  CR12252 ("Nothing that could qualify as a trade secret was 'used' as that word is defined in the case law.").

### 2. The evidence conclusively establishes that there was no use of a trade secret.

Lakeway Regional's and SDP's summary judgment evidence conclusively established that Sossi did not use any LTT trade secret in drafting the May 10 email. CR6013-14, 6435-36. Sossi confirmed that "[a]ny information conveyed to HUD about LTT or Lake Travis Hospital on May 10, 2010, and afterward resulted from information obtained from Health Care REIT and from publicly available sources." *Id*. at 6014, 6436. Sossi had been communicating with Health Care REIT since March 2008 about LTT and Lake Travis Hospital (*id*.), well before the Letter of Intent was signed in September 2009. This evidence is uncontroverted.

### 3. There is no evidence of *disclosure* of a trade secret.

To establish disclosure, LTT must show that Lakeway Regional and SDP made an LTT trade secret known to the public. *See, e.g.*, *Precision Plating & Metal Finishing, Inc. v. Martin-Marietta Corp.*, 435 F.2d 1262, 1263 (5th Cir. 1970) (per curiam) (noting that plaintiff had developed a "secret process" and that defendant "made such public disclosure of the process" so as to destroy the value of the process); *see also* Restatement of Torts § 757 cmt. c (discussing difference between "mere disclosure" and use); Black's Law Dictionary 562 (10th ed.) (defining "disclosure" as "[t]he act or process of making known something that was previously unknown").

Nowhere in LTT's page-and-a-half discussion of disclosure (Cross-App. Br. 26-27) does LTT identify a specific alleged trade secret that Lakeway Regional or SDP actually disclosed. For example, LTT recounts that Sossi shepherded Lakeway Regional's application through the HUD process. *Id.* But this is not evidence that Sossi **disclosed LTT's trade secrets** during that process.

LTT next points to the June 21 letter where Sossi (i) stated that he discussed LTT's facility in detail with HUD, (ii) referenced a prior discussion he had with HUD's client service team about LTT's facility, and (iii) stated his expectation that HUD would defend its loan commitment. But nothing in the June 21 letter (CR8108-10) suggests that non-public information concerning Lake Travis Hospital was part of that discussion, and no specific trade secret has been identified in this letter either. As with the May 10 email and the use claim, LTT never identifies a "trade secret" disclosed in the June 21 letter.[7]

Speculation that Sossi **might** have disclosed an LTT trade secret to HUD during any discussion is no evidence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (evidence must transcend mere suspicion); *Gillis v. Provost & Umphrey Law Firm, LLP*, No. 05-13-00892-CV, 2015 WL 170240, at \*14 (Tex. App.—Dallas Jan. 14, 2015, no pet.) (applying rule on facts analogous to those here).

---

[7] LTT also includes an obligatory mention of the May 10 email in its disclosure argument but points to no particular statement in the email that discloses a trade secret. Cross-App. Br. 26-27.

LTT's reliance on *Lamont v. Vaquillas Energy Lopeno Ltd., LLP*, 421 S.W.3d 198 (Tex. App.—San Antonio 2013, pet. denied) is, therefore, misplaced. In *Lamont*, it was unnecessary for the jury to speculate whether the defendant used the plaintiff's seismic data in deciding to acquire a gas prospect because the ***only*** seismic data that existed concerning the prospect had been developed by the plaintiff. *Id*. at 213-16. Here, LTT wants this Court to reverse the trial court's judgment by speculating that Sossi disclosed LTT's alleged trade secrets during discussions with HUD, even though there were several sources of his information about LTT's Lake Travis Hospital, as noted above. That would be improper. *Ford Motor Co.*, 135 S.W.3d at 601.

### 4. The evidence conclusively establishes that there was no disclosure of a trade secret.

Lakeway Regional and SDP conclusively established that neither disclosed trade secrets to HUD. CR6013-14, 6435-36. That evidence stands uncontroverted and serves as an independent basis for affirming the summary judgment. *Star-Telegram*, 915 S.W.2d at 473; *see also supra* at Section I.B.2-3.

### C. There is no evidence that a purported disclosure or use caused LTT any damages, and the evidence conclusively negates causation.

To recover any type of damages, there must be "a direct causal link between the damages awarded, the actions of the defendant and the injury suffered." *Houston Mercantile Exch. Corp. v. Dailey Petroleum, Corp.*, 930 S.W.2d 242, 248

(Tex. App.—Houston [14th Dist.] 1996, no writ) (applying rule of law in misappropriation case); *see also Hunter Bldgs. & Mfg., L.P. v. MBI Global, L.L.C.*, 436 S.W.3d 9, 20-22 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (same); *Rusty's Weigh Scales & Serv., Inc. v. N. Tex. Scales, Inc.*, 314 S.W.3d 105, 111 (Tex. App.—El Paso 2010, no pet.) (same).

### 1. There is no evidence of causation.[8]

Lakeway Regional and SDP moved for summary judgment on the basis that LTT had no evidence that it sustained damages **resulting from** the alleged misappropriation of its trade secrets. CR5629-31, 6050-52. Specifically, Lakeway Regional and SDP pointed out that LTT had no evidence that HUD's decision to amend, close, or fund was based upon any information HUD had obtained in connection with LTT's proposed facility. *Id*.

LTT failed to raise legally sufficient evidence of causation. Instead, Berry generally testified that as "a result of Defendants' misconduct," LTT lost nearly all of its market value. CR7614-15. But Berry never connected LTT's alleged loss in value **to misappropriation**, as distinct from other alleged misconduct.

LTT attempts to avoid the element of causation by arguing that it was not required to show reliance by HUD. The sole basis for this argument is that LTT

---

[8] This argument also runs through Lakeway Regional's and SDP's Appellants' Brief and upon examination, the summary judgment evidentiary and trial records are virtually identical. Meaning, there is no evidence of causation to support any of LTT's causes of action.

claims to seek reasonable royalty damages that are "not dependent upon proof that HUD relied on" any improper disclosure or use of its trade secrets. Cross-App. Br. 31. This argument fails on many accounts.

*First*, the decisions made by HUD were to issue the commitment, to agree to the amendment of terms requested by Lakeway Regional, and to close. HUD issued the commitment on March 17, 2010. CR5884, 6306. Prior to that time, HUD's representative testified that no "person associated with Lakeway Regional or SDP disclose[d] any information to HUD regarding LTT." *Id*. Thus, Lakeway Regional could not have provided HUD with any of LTT's trade secret information as of that date, and HUD could not have relied upon any such information in issuing the commitment. HUD agreed to the amendment on May 20, 2010, and the closing occurred the following day. CR5886, 6308. Because there is no evidence that HUD's decision to amend or close was based upon or influenced in any way by any of the information provided by Sossi or what information was relied on, no-evidence summary judgment was proper. *See Hancock v. Variyam*, 400 S.W.3d 59, 70-71 (Tex. 2013) (holding there was no evidence of why a particular decision was made when there are multiple possible inferences for why the decision was made).

***Second***, LTT presented no evidence of the amount of a reasonable royalty, and the idea of a reasonable royalty is found nowhere in Berry's declaration. CR7604-17.

***Third***, the concept of a reasonable royalty is absent from LTT's evidence because it never disclosed that measure of damages in its disclosure responses. CR5958. LTT amended or supplemented its disclosures numerous times[9] and disclosed three damage models for its misappropriation claim.[10] Yet there was no mention of a reasonable royalty, barring that measure from being considered. Tex. R. Civ. P. 193.6.

### 2. The evidence conclusively negates causation.

Lakeway Regional and SDP also moved for summary judgment on the basis that any communication with HUD did not cause LTT injury as a matter of law. CR5602, 5609, 5629-31, 6020, 6046, 6051-52. Their argument was twofold.

First, the sole HUD witness deposed in this matter testified that prior to the issuance of the commitment on March 17, 2010, no "person associated with

---

[9] The version in effect was served two months before the summary judgment responses. CR5950-63.

[10] The three separate damages models for its misappropriation claim were as follows: (1) its lost value to itself and to its trade secrets; (2) Lakeway Regional's savings and profits; and (3) the monies LTT would have been paid had the deal closed. CR5958. This last measure is necessarily irrelevant to LTT's misappropriation claim because (1) Lakeway Regional decided in March 2010 not to acquire the Lease (CR5709, 6131), two months before Sossi sent the May 10 email and (2) there was no claim, and no evidence, that Lakeway Regional made that decision as a result of any alleged misappropriation of LTT's alleged trade secrets.

LRMC or SDP disclose[d] any information to HUD regarding LTT." CR5884, 6306. Therefore, neither Lakeway Regional nor SDP could have provided HUD with any LTT alleged trade secret information before that date.

Second, HUD has stated that even if it had considered Lake Travis Hospital, it still would have recommended insuring Lakeway Regional. CR5980, 6403. Accordingly, even if some alleged trade secret was used or disclosed, it would not have mattered given this evidence. *Rusty's*, 314 S.W.3d at 111 (requiring causative link).[11]

* * *

The bottom line is that LTT's argument—both below and now on appeal— amounts to nothing more than, "We have some trade secrets (though we have not specifically identified them), and we gave a bunch of information to Lakeway Regional and SDP, so they must have improperly used our trade secrets when obtaining HUD insurance, thus causing LTT harm." That kind of vague claim, following two years of discovery, was properly found wanting. Summary judgment was properly granted.

---

[11] LTT's expert's opinion that HUD would have been negligent not to consider Lake Travis Hospital (Cross-App. Br. 31-32) is not relevant in light of the HUD representative's unchallenged statement.

**II.** **The Trial Court Correctly Granted Summary Judgment in Lakeway Regional's and SDP's Favor on LTT's Claim for Breach of Section 2 of the Letter of Intent.**

Lakeway Regional moved for summary judgment on LTT's Section 2 claim for two independent reasons: (1) Section 2 is an unenforceable agreement to agree, and (2) two of the five conditions precedent to Lakeway Regional's obligations under Section 2 (which conditions are set forth in Section 3) were not satisfied. CR5608-09, 5618, 5622. SDP moved for summary judgment on the same grounds and on the additional ground that, as a non-party to the Letter of Intent, it could not be liable for its breach. CR6020, 6035-45. Both motions were properly granted. CR12266.

**A.** **Section 2 of the Letter of Intent is an unenforceable agreement to agree, foreclosing a claim for its breach.**

An agreement which leaves material or essential terms open for future adjustment and agreement is unenforceable. *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000). Failure to agree on even one essential term is fatal. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).

This Court recently enforced these bedrock principles and held that a letter agreement providing that the plaintiff would be the general contractor on the defendant's project, a commercial development, lacked essential terms, thus rendering it an unenforceable agreement to agree as a matter of law. *Martin v.*

*Beitler*, No. 03-13-00605, 2015 Tex. App. LEXIS 6894, at \*24-28 (Tex. App.—Austin July 7, 2015, no pet.) (mem. op.) (whether agreement "has all the essential terms to be legally enforceable is a question of law"); *see also DKH Homes, LP v. Kilgo*, 03-10-00656-CV, 2011 WL 1811435, at \*3 (Tex. App.—Austin May 11, 2011, no pet.) (mem. op.) ("To be enforceable, an agreement to enter into a future contract must specify all its material and essential terms, leaving none to be agreed on as the result of future negotiations.").

These same foundational principles apply here.

### 1. The Letter of Intent contains several provisions showing that Section 2 is an unenforceable agreement to agree.

First, the Letter of Intent's opening paragraph demonstrates that the purpose of the agreement was to set forth a process for evaluating a ***possible*** transaction, but there was not yet an agreement to the actual transaction outlined in Section 2 and there might never be. *See* CR5697 ("The objective of this Binding Letter of Intent is to indicate SDP's interest in the Project and to establish the ground rules for the ongoing exchange of information between the Parties to facilitate the development of the Project and the exchange of information required for such a process to succeed.").

Second, other portions of the Letter of Intent confirm that the assignment of the Lease as outlined in Section 2 may never occur. Section 1, for example, identifies a 45-day period during which the parties would have discussions and

negotiations "with regards to evaluating and implementing the ***proposed*** Project,"—i.e., whether the parties would proceed forward under the outline of terms in Section 2.  *Id.* (emphasis added).  Section 3 addresses a "reasonable due diligence process," which would precede any decision by Lakeway Regional whether to acquire the Lease under Section 2.  What would be the purpose of a negotiation period or a reasonable due diligence process if the parties were already obligated to close under Section 2?

Sections 3 and 4 further provide that ***if*** the negotiations were successful, then "definitive" agreements would be executed.  LTT nonetheless claims that references to a definitive agreement is no problem because the parties also agreed that the definitive documents would "*fully reflect* the intention of the Parties *expressed in this Letter of Intent*."  Cross-App. Br. 35.  LTT's argument might have force if the Letter of Intent actually contained all essential terms, but it did not.  The concept that a later agreement would reflect the intent of the Letter of Intent is simply a means of saying that any terms in the Letter of Intent would be reflected in the final agreement, not that the terms in the Letter of Intent were a complete and final expression of all material and essential terms.

Section 5 alone topples LTT's argument.  Section 5 provides that "this Letter of Intent may be terminated by either Party, for any reason, with written notice to the other Party."  The Letter of Intent cannot have both required LTT and Lakeway

Regional to proceed with the Lease assignment as outlined in Section 2 but have allowed either to terminate the Letter of Intent for ***any reason***. Indeed, the only reasonable construction of the Letter of Intent, when each of its provisions is considered (not just those on which LTT now focuses) is that, up until the time at which the Lease would be assigned, either side could terminate the Letter of Intent, with certain obligations (*e.g.*, confidentiality) surviving the termination. *See* Sections 5, 10.7. Violating settled rules of contract construction, LTT would have this Court delete both Sections 5 and 10.7. Indeed, a basic rule of contract construction is that a court determines the parties' intentions by considering the entire contract as a whole, harmonizing and giving effect to all the contract provisions so that none will be rendered meaningless. *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014); *see also Kachina Pipeline Co. v. Lillis*, No. 13-0596, 2015 Tex. LEXIS 914, at *9 (Tex. Oct. 9, 2015) (courts must give effect to each contract provision).

Further evidencing the parties' intent that Lakeway Regional would not be obligated to close is the standstill provision in Section 6. That Section preserves Berry's and McDonald's rights to continue working on their plans for operating the facility, and continue recruiting investors for equity positions in Lake Travis Hospital or other operational matters. If Lakeway Regional was committed to the

Lease assignment under Section 2, then why would Berry and McDonald need those rights?

Multiple sections of the Letter of Intent thus establish that there was no enforceable agreement, only an agreement to agree. The Letter of Intent makes clear that there was merely a possible transaction with no obligation to close, that definitive agreements would still need to be drafted, and that the parties could back out at any time.

### 2. Essential terms are lacking.

And then there is the insurmountable problem of missing essential terms from the Letter of Intent, including the following:

- ***Scope of Development of the Project***. The stated objective of the Letter of Intent was "to indicate SDP's interest in the Project and to establish the ground rules for the ongoing exchange of information between the Parties to facilitate the development of the Project [defined as Lake Travis Hospital serving as the initial campus for Lakeway Regional and later as a satellite campus] and the exchange of information required for such a process to succeed." CR5697. The Letter of Intent contains no terms concerning the "development" of either facility at issue—Lake Travis Hospital and Lakeway Regional. Nor does it contain terms related to the "process" for such development.

- ***Compensation or Severance Costs***. Section 2.2 refers to offering compensation or severance to certain executives affiliated with Lake Travis Hospital. The Letter of Intent contains no amounts for either the compensation or the severance.

- ***Reimbursement Amount***. The Letter of Intent refers to a reimbursement of "reasonable and documented costs" incurred by LTT's principals, "including, without limitation" three types of

expenses (employee benefits, planning/construction expenses, and interest expenses). The Letter of Intent does not name all the costs, list the amounts of any costs, or provide guidelines for determining what is a "reasonable" cost.[12]

- ***Appropriate Funding***.  A condition precedent under the Letter of Intent is Lakeway Regional being able to "obtain appropriate funding to allow for this expansion of the operation plans for LRMC."  The Letter of Intent does not define what amount of funding would be considered appropriate.  Nor does it describe, in any way, the type of funding to be obtained.  For example, if the transaction was to be owner-financed, there are no terms describing the financing to be provided by LTT.

Without these essential terms, there is no enforceable agreement.  *See Martin*; *DKH Homes*.

LTT's authorities are inapposite.  *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416 (Tex. 2013) (per curiam) stands for the unremarkable proposition that "[a]greements to enter into future contracts are enforceable if they contain all material terms."  *Id.* at 418.  Applying that principle, *McCalla* held that the parties' post-verdict settlement agreement did in fact contain all the essential terms.  *McCalla* put it like this: "[i]f a court was trying to enforce the settlement agreement, it could find all the terms necessary for its enforcement" in the agreement.  *Id*.

---

[12] LTT's reliance on *Fuqua v. Fuqua*, 750 S.W.2d 238 (Tex. App.—Dallas 1988, writ denied), for the proposition that an agreement is enforceable even if a specific dollar amount is missing is misplaced.  *Id*. at 245-46.  Here, it was not just the **amount** of the costs that was uncertain, but also the **types** of costs that would be recoverable.

36

That hurdle is one LTT cannot clear. Unlike the settlement agreement in *McCalla*, a court here could not find all necessary terms in Section 2 for its enforcement. For example, it cannot be determined—from the face of the document—how much to order Lakeway Regional to refund to Berry and McDonald at the closing, or to whom Lakeway Regional was to offer employment. *McCalla* is also distinguishable because it did not contain a mutual termination provision as Section 5 does here.

Nor does *Karns v. Jalapeno Tree Holdings, L.L.C.*, 459 S.W.3d 683 (Tex. App.—El Paso 2015, pet. denied) advance LTT's argument. As LTT notes, *Karns* held that "if the LOI contains all essential terms as contemplated by the parties and the only remaining issue is formalization of the agreement or negotiation of ancillary terms, then the LOI may be an enforceable contract if the parties intended to be bound.'" *Id.* at 692. LTT again misses the issue. The issue is not what is required for an enforceable contract. Everyone agrees that a contract must contain all essential terms to be enforceable. The issue is whether the Letter of Intent contains all the essential terms. As explained above, it does not.

Notably, LTT does not expand on its discussion of *Karns* beyond reciting its holding, and with good reason: *Karns* reinforces that summary judgment against LTT on its Section 2 claim was required. Karns entered into a letter of intent to purchase the defendant's Mexican restaurant chain. The *Karns* letter of intent had

many of the same provisions as does the one here, including a provision indicating the mechanics and structure of the proposed transaction, an outline of the due diligence procedure, a remedies provision in the event of a breach, and a termination provision. *Id*. at 687-88. After the defendant terminated, Karns filed suit for breach of contract. *Id*. at 688.

The trial court's determination that the letter of intent's term for sale was not legally enforceable was affirmed on appeal. *Id*. at 694. The appellate court began by noting that the letter of intent contained two types of covenants: those relating to the negotiation process and those relating to the anticipated sale. *Id*. at 692. It then held that the agreement contained an enforceable set of rules pertaining to the negotiation process, but not as to sale. *Id*. at 693-94. This is consistent with the order granting summary judgment on LTT's Section 2 claim as the trial court held some terms enforceable (those that survived termination as set forth in Section 10.7, concerning the negotiation process, and were the subject of the jury trial), and others unenforceable (those that outlined the terms for the potential Lease acquisition).[13]

---

[13] *Karns* also rejected LTT's argument (Cross-App. Br. 36) that a remedies provision renders every term of a letter of intent enforceable. 459 S.W.3d at 692.

38

### 3. Section 2 is unenforceable for the separate reason that Section 3's best efforts provision is prohibitively vague.

Yet another reason that Section 2 is unenforceable is found in Section 3, which contains a vague and unenforceable "best efforts" provision for satisfying the conditions precedent. The "best efforts" provision contains no guidelines by which to measure best efforts (nor is there evidence by which to measure the quality of any efforts). As courts have recognized, a "best efforts" provision is a "nebulous standard," and to be enforceable, the provision must set a guideline against which best efforts can be measured. *CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.*, 809 S.W.2d 577, 581 (Tex. App.—Dallas 1991, writ denied) (a best efforts provision untethered to guidelines is unenforceable); *see also Kevin M. Ehringer Enters., Inc. v. McData Servs. Corp.*, 646 F.3d 321, 327 (5th Cir. 2011) (holding best efforts provision unenforceable for lack of guidelines); *York Grp., Inc. v. York S., Inc.*, No. H-06-0262, 2006 WL 2883363, at *3 (S.D. Tex. Oct. 10, 2006) (holding best efforts provision unenforceable because there were no guidelines to satisfy the *CKB* standard).

LTT touches on best efforts (Cross-App. Br. 33), but only to recite the divide between enforceable and unenforceable best efforts provisions and then to conclude with the non-sequitur that Lakeway Regional and SDP have acknowledged that the noncircumvision and confidentiality sections of the Letter

of Intent are binding. *Id.* at n.9. But nothing in either Section 6 or 9 provides guidelines for measuring compliance with a best efforts provision.

**4. LTT's remaining appellate arguments do not withstand scrutiny.**

Equally unavailing is LTT's effort to show that Section 2 is enforceable by identifying those terms that set forth Lakeway Regional's obligations. Cross-App. Br. 35 n.10, 37-38 (collecting the terms regarding Lakeway Regional's obligations to assume the Lease and to make certain payments). The inquiry is not whether the writing contains some terms or even some material terms but is instead whether the writing contains "***all*** . . . material terms." *DKH Homes*, at *2 (emphasis added). This principle is a corollary to the settled rule that courts are not in the contract-writing business. *Bryant v. Clark*, 358 S.W.2d 614, 616 (Tex. 1962) (affirming order denying request for specific performance where contract lacked essential terms).

Similarly, LTT's contention that the Letter of Intent reflects the parties' intent to be bound (Cross-App. Br. 35) begs the question: bound to what? The answer, found in the Letter of Intent itself, is that the parties intended to be bound only to the agreed-to ground rules for negotiating a possible assignment of the Lease that would protect their respective interests during and after the Negotiation Period (i.e., certain confidential and standstill covenants). Sections 6, 9, 10.7. ***Those terms are binding****. Karns*, 459 S.W.3d at 692-93.

40

But the Letter of Intent contains **no** binding agreement requiring Lakeway Regional to become the tenant under the Lease. Stating that it is binding does not make it so. *Fid. Fin. Servs. of the Sw., Inc. v. Corilant Fin., L.P.*, 376 S.W.3d 253, 255-58 (Tex. App.—Dallas 2012, pet. denied) (holding unenforceable a letter of intent even though it stated: "THIS LETTER OF INTENT IS A LEGALLY BINDING AND ENFORCEABLE AGREEMENT.").

## B. Unfulfilled conditions precedent foreclosed LTT's Section 2 claim.

Section 3 of the Letter of Intent, titled Required Approvals for the Project, lists five separate conditions precedent to Lakeway Regional's Section 2 obligation to acquire the Lease. Lakeway Regional and SDP moved for summary judgment on the basis that the evidence conclusively established that two conditions precedent were not satisfied and that LTT had no evidence to the contrary. CR5622-24, 6043-45.

***Lakeway Regional's Board of Managers disapproved of the project.*** A condition precedent to Section 2 was "full and formal approval by the Board of Managers of LRMC." CR5699. The summary judgment evidence conclusively established that a majority of Lakeway Regional's Board of Managers disfavored the transaction. CR5840-42, 7721. LTT does not dispute that the required number of votes for "full and formal approval" were not there. Cross-App. Br. 41. Instead, LTT argues that the absence of required favorable votes does not matter

because Lakeway Regional did not hold a formal vote on the transaction, or that there was at least a fact issue on whether defendants prevented the condition from occurring. *Id.* In so arguing, LTT attempts to transform a condition precedent that required Board ***approval*** into a provision that required a Board vote. That is simply not what the contract says.

LTT's case, *Clear Lake City Water Authority v. Friendswood Development Co.*, 344 S.W.3d 514 (Tex. App.—Houston [14th Dist.] 2011, pet. denied), does not advance its position. In *Clear Lake*, the defendant governmental entity agreed to buy water and sewer facilities from the plaintiff residential developer if voters approved a bond measure and the government agreed to include the bond measure on every bond election held subsequent to the parties' agreement. *Id*. at 517. However, the government did not include the bond measure in each subsequent election. When the developer sued for breach of contract, the government defended on the basis that its obligation to buy the facilities was conditioned on voter approval, which had not occurred and alternatively, there was no breach because it could prove that the voters would have rejected the bonds. *Id*. at 518. The appellate court held that the government "cannot rely on a ***projected*** failure of voter approval, which it prevented or made impossible by breaching its agreement to include the bond measure on every bond election held subsequent to the

agreements, to escape its liability to purchase the Developers' facilities." *Id.* at 520 (emphasis added).

*Clear Lake* is not analogous to this case. First, in *Clear Lake*, the agreement required placing the bond measure on the ballot for an actual vote, whereas the Letter of Intent does not require a formal vote. Second, here, unlike *Clear Lake*, there was no **projected** voter disapproval but instead **actual** voter disapproval. CR5840-42, 6262-65.

***The evidence conclusively proved the absence of HCN's approval.*** Another condition precedent to Section 2 was "approval of HCN as landlord under the Lease to the assignment thereof." CR5698. The summary judgment evidence conclusively established that HCN did not agree to the assignment of the Lease (and LTT presented no evidence that it had), a separate condition precedent to Lakeway Regional's obligation under Section 2. CR5623, 5821, 5876-77, 6044.

LTT's argument that Lakeway Regional and SDP "made no effort" to obtain HCN's approval for the assignment of the existing Lease (Cross-App. Br. 40) is factually incorrect and beside the point. HCN's representative testified that Lakeway Regional attempted to negotiate in good faith the replacement lease but the parties were nonetheless unable to come to an agreement. CR5874, 6296. HCN's representative also testified that the LTT lease "would have been replaced by a new lease" between the landlord and Lakeway Regional. *Id.*

LTT also relies on *Sharifi v. Steen Automotive, L.L.C.*, 370 S.W.3d 126, 146 (Tex. App.—Dallas 2012, no pet.) and *II Deerfield Limited Partnership v. Henry Building, Inc.*, 41 S.W.3d 259, 265 (Tex. App.—San Antonio 2001, pet. denied), which hold that where a defendant makes a choice that prevents the condition precedent from being satisfied or interferes with performance of a condition precedent, it cannot avail itself of its own nonperformance. These cases do not apply here. It was not because of Lakeway Regional's "choice" that HCN did not agree to the new lease and it did not interfere. As noted above, HCN's testimony stands uncontroverted that Lakeway Regional acted in good faith in attempting to reach an agreement on terms of a new lease. CR5623, 5821, 5876-77, 6044.

Simply put, summary judgment was proper because LTT failed to satisfy these conditions precedent, and further failed to present probative evidence that these conditions were satisfied or that it was excused from satisfying them.

## C. SDP cannot be liable under Section 2 because it was not a party to the Letter of Intent.

In addition to moving for summary judgment on the same grounds as Lakeway Regional, SDP also moved for summary judgment on LTT's Section 2 claim on the basis that, as a non-party to the Letter of Intent, it could not be held liable for breach. CR6027, 6035-38.[14]

---

[14] This argument was styled as, "The Court should grant summary judgment on LTT's claim for breach of the LOI because as a disclosed agent, SDP has no liability under the LOI." CR6035.

44

The trial court granted summary judgment for SDP on LTT's Section 2 claim, stating simply, "The Court hereby **GRANTS** the Motions only with respect to Plaintiff's claim that LRMC and SDP breached Section 2 of the Letter of Intent." CR12266. Because the trial court's order did not identify a particular basis, to defeat the summary judgment on appeal, LTT must overcome each independent basis supporting the granting of summary judgment. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000); *Star-Telegram*, 915 S.W.2d at 473; *see also Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.*, 207 S.W.3d 801, 826-27 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). However, in its brief, LTT did not address the independent basis for summary judgment in SDP's favor—that SDP is not a party to the Letter of Intent. Because LTT did not address this independent basis, the summary judgment as to SDP on LTT's Section 2 claim must be affirmed. *Star-Telegram*, 915 S.W.2d at 473.

Summary judgment on LTT's Section 2 claim should be affirmed.

### III. The Trial Court Correctly Sustained Lakeway Regional's and SDP's Objections to LTT's Summary Judgment Evidence.

The trial court did not abuse its discretion in sustaining certain objections to LTT's summary judgment evidence. But even if the Court were to find otherwise, the reintroduction of the excluded evidence would not impact the arguments raised above.

**A. The trial court did not abuse its discretion in sustaining Objection 2.**

Lakeway Regional and SDP objected to LTT's summary judgment evidence on the basis that LTT cited only 189 pages of the 2,033-page Project File among numerous other general references to the entire Project File, which is improper when responding to a no-evidence summary judgment motion. CR11487 (objecting on the basis that "[g]eneral references to voluminous records are not proper responses to a no-evidence motion for summary judgment"). The trial court properly exercised its discretion when it sustained this objection. CR12261; *HK Partners, Inc. v. Power Computing Corp.*, No. 03-98-00124-CV, 1999 Tex. App. LEXIS 3981, at *6 (Tex. App.—Austin May 27, 1999, no pet.) (non-movant failed to raise a fact issue where it attached over 900 pages of material to its responses but failed to direct the trial court to specific evidence); *see also Nguyen*, 404 S.W.3d at 776-77.

LTT claims that the trial court erred because its amended summary judgment responses cited about 775 individual pages within the Project File, but again, those references directed the trial court to where it might find evidence of "confidential, proprietary *and* trade secret information" (CR11813-14, 11919-20 (emphasis added)), requiring the trial court to sift through those pages to see which, if any, of

those pages contained information about a trade secret as distinct from information that qualified as confidential or proprietary under the terms of the Letter of Intent.[15]

LTT next claims that the trial court could have looked to Berry's declaration because he "provided detailed testimony on the contents of the Project File." But as noted above, Berry referenced the entire Bates range of the Project File, CR7606, so he too failed to direct the trial court to specific portions in the Project File that constituted a trade secret. (As noted *supra*, Berry did not supplement his declaration in support of LTT's amended summary judgment responses.) Thus, even assuming the trial court was required to look to one exhibit to find its way to another exhibit, which it was not required to do, the trial court would still not have gotten to the evidence that would have created a fact issue that a trade secret exists (even assuming it exists). *See supra* at Section I.[16]

---

[15] Because Lakeway Regional and SDP moved for summary judgment on LTT's claim that they had breached the Letter of Intent by disclosing confidential and proprietary information as defined in the Letter of Intent and LTT's separate misappropriation claim, it was incumbent upon LTT to identify which documents and information were confidential and proprietary under the Letter of Intent as distinct from a trade secret under the common law. CR171-72, 5608, 6027.

[16] LTT's reliance on *Hinojosa v. Columbia/St. David's Healthcare Sys., L.P.*, 106 S.W.3d 380 (Tex. App.—Austin 2003, no pet.), is misplaced as that case did not involve voluminous exhibits, a distinction courts have found important. *E.g.*, *Ramirez v. Colonial Freight Warehouse Co.*, 434 S.W.3d 244, 250-51 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *Nguyen*, 404 S.W.3d 777 n.4; *HK Partners*, 1999 Tex. App. LEXIS 3981, at *6.

**B. The trial court did not abuse its discretion in sustaining Objection 4.**

Lakeway Regional and SDP objected to two sentences in paragraph 5 of Berry's Declaration on the basis that they were conclusory. The two sentences were that LTT "owned the confidential, proprietary and trade secret information contained in the Project File" and that he and McDonald "had an ownership interest in the information as well, and were authorized to disclose it pursuant to the [Letter of Intent] on behalf of LTT." CR11488. Lakeway Regional and SDP complained that Berry did not provide any facts regarding LTT's "purported acquisition, development, or ownership of *any of the particular documents* contained in the Project File." *Id*. (emphasis added). They further objected that Berry's statement of ownership was necessarily conclusory as many of the documents in the Project File were not trade secrets but were documents created by Lakeway Regional and SDP or correspondence between them and third parties. CR11488-49. As noted above, the third document in the Project File (CR8682) is an email from a third party to Alexander (SDP's CEO) and Sossi that was sent before SDP and Lakeway Regional signed any confidentiality agreement, and that email contains no information that could possibly be construed as a trade secret. Thus, Berry could not have truthfully stated under oath that LTT owned documents that were created by third parties. The trial court properly exercised its discretion in sustaining this objection. CR12261.

48

LTT argues that Berry's statement of ownership was not conclusory because he detailed the time, effort, and expense that went into developing the trade secrets and how it was that he came to have personal knowledge. But this is not the point. When responding to the no-evidence motions, LTT was required to show the trial court particular evidence of a "trade secret." It is improper to refer to hundreds of pages of documents and discuss broad categories of information allegedly qualifying as a trade secret, but never match a document to the information description. *Game Sys., Inc. v. Forbes Hutton Leasing, Inc*., 02-09-00051-CV, 2011 WL 2119672, at \*23 (Tex. App.—Fort Worth May 26, 2011, no pet.) (mem. op.) (holding that a statement that certain information "constitutes a trade secret" is not competent summary judgment evidence). Yet that is precisely what happened here.

Because Berry never identified specific portions of the Project File that were owned by LTT, the trial court properly concluded that his statements of ownership were necessarily high level and conclusory.

## PRAYER

Cross-Appellees Lakeway Regional Medical Center LLC and Surgical Development Partners, LLC request that the Court affirm the trial court's (1) order granting summary judgment and (2) order sustaining their objections to LTT's

summary judgment evidence.  They ask for all other relief to which they may be justly entitled.

Respectfully submitted,

NORTON ROSE FULBRIGHT US LLP

By: _____/s/ Jeff Cody_____
     Jeff Cody
     State Bar No. 04468960
     jeff.cody@nortonrosefulbright.com
     Barton W. Cox
     State Bar No. 2406508
     beau.cox@nortonrosefulbright.com
     James V. Leito IV
     State Bar No. 24054950
     james.leito@nortonrosefulbright.com
2200 Ross Avenue, Suite 3600
Dallas, TX 75201-7932
Telephone:  (214) 855-8000
Telecopier:  (214) 855-8200

and

NORTON ROSE FULBRIGHT US LLP
     Joy M. Soloway
     State Bar No. 18838700
     joy.soloway@nortonrosefulbright.com
1301 McKinney, Suite 5100
Houston, Texas  77010
Telephone:  (713) 651-5151
Telecopier:  (713) 651-5246

*Counsel for Appellant/Cross-Appellee,*
*Lakeway Regional Medical Center, LLC*

and

WRIGHT & CLOSE, LLP
Jessica Z. Barger
*barger@wrightclose.com*
State Bar No. 24032706
Raffi O. Melkonian
*melkonian@wrightclose.com*
State Bar No. 24090587
One Riverway, Suite 2200
Houston, TX 77056
Telephone: (713) 572-4321
Telecopier: (713) 572-4320
*Counsel for Appellant/Cross-Appellee*
*Surgical Development Partners, LLC*

## CERTIFICATE OF WORD COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), the undersigned counsel – in reliance upon the word count of the computer program used to prepare this document – certifies that this brief contains 11,742 words, excluding the words that need not be counted under Texas Rule of Appellate Procedure 9.4(i)(1).

*/s/ Joy M. Soloway*
JOY M. SOLOWAY

54151498

51

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of November 2015, Appellants/Cross-Appellees served a copy of this Cross-Appellees' Brief by electronic service (via FileTime) and email upon the following counsel of record:

Ms. Jane Webre (jwebre@scottdoug.com)
Mr. S. Abraham Kuczaj III (akuczaj@scottdoug.com)
Ms. Paige A. Amstutz (pamstutz@scottdoug.com)
Mr. Steven J. Wingard (swingard@scottdoug.com)
SCOTT, DOUGLASS & MCCONNICO, L.L.P.
One American Center
303 Colorado Street, Suite 2400
Austin, TX 78701
*Counsel for Appellee/Cross-Appellant,*
*Lake Travis Transitional LTCH, LLC*
*n/k/a Lake Travis Specialty Hospital, LLC*

Mr. Robert Bragalone (bbragalone@gordonrees.com)
Mr. B. Ryan Fellman (rfellman@gordonrees.com)
Mr. Steven Lawson (slawson@gordonrees.com)
GORDON & REES LLP
2100 Ross Avenue, Suite 2800
Dallas, TX 75201
*Counsel for Appellees Brennan, Manna &*
*Diamond, LLC and Frank T. Sossi*

*/s/ Joy M. Soloway*
JOY M. SOLOWAY

54151498